EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Fredy I. Reyes Sorto, Gerardo Cerra Ortiz, Luis S. Berríos Montes, Luis Sousa Gallardo, Antonio Sanes Rosario, Edgardo Camacho García, José T. Santiago Díaz y Daniel Gómez Marrero<br><br>Apelados<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico por conducto de su Secretaria de Justicia, Honorable Wanda Vázquez Garced<br><br>Apelados<br><br>Colegio de Ingenieros y Agrimensores de Puerto Rico, por conducto de su Presidente, Ing. Pablo Vázquez Ruiz<br><br>Apelantes | Apelación<br><br>2023 TSPR 62<br><br>211 DPR ___ |

Número del Caso: AC-2021-0072

Fecha: 4 de mayo de 2023

Tribunal de Apelaciones:

Panel VIII

Abogados de la parte apelante:

Lcdo. William Vázquez Irizarry
Lcdo. Alberto Omar Jiménez Santiago
Lcdo. Carlos E. Cardona Fernández

Abogado de la parte apelada:

Lcdo. Armando Del Valle Muñoz

Oficina del Procurador General:

Hon. Fernando Figueroa Santiago
Procurador General

Lcdo. Omar Andino Figueroa
Subprocurador General

Abogados del *Amicus Curiae:*

     Lcdo. Ramón L. Rosario Cortés
     Lcdo. Ferdinand Ocasio
     Lcdo. Miguel A. Rodríguez Ramos

Materia:  Sentencia con Opiniones de conformidad y Opinión disidente.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Fredy I. Reyes Sorto, Gerardo Cerra Ortiz, Luis S. Berríos Montes, Luis Sousa Gallardo, Antonio Sanes Rosario, Edgardo Camacho García, José T. Santiago Díaz y Daniel Gómez Marrero<br><br>Apelados<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico por conducto de su Secretaria de Justicia, Honorable Wanda Vázquez Garced<br><br>Apelados<br><br>Colegio de Ingenieros y Agrimensores de Puerto Rico, por conducto de su Presidente, Ing. Pablo Vázquez Ruiz<br><br>Apelantes | AC-2021-0072 |

SENTENCIA

En San Juan, Puerto Rico, a 4 de mayo de 2023.

Visto el Art. V, Sec. 4 de la Constitución de Puerto Rico, que dispone que ninguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces o juezas de que esté compuesto el Tribunal, nos encontramos igualmente divididos.

En consecuencia, se revoca la *Sentencia* dictada por el Tribunal de Apelaciones que declaró inconstitucional la Sec. 3 de la Ley Núm. 319 de 15 de mayo de 1938, Ley del Colegio de Ingenieros y Agrimensores de Puerto Rico, 20 LPRA sec. 733, que exige la colegiación compulsoria de los ingenieros y agrimensores para que estos puedan ejercer su profesion en Puerto Rico. Véase también, *Sánchez Rodríguez v. López Jiménez*, 116 DPR 392 (1985). En vista de ello, se desestima la demanda instada en el recurso de epígrafe.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Rivera García emitió una *Opinión de conformidad* a la cual se le une la Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Estrella Martínez. El Juez Asociado señor Colón Pérez emitió una *Opinión de conformidad*. El Juez Asociado señor Martínez Torres emitió una *Opinión disidente* a la cual se le une la Jueza Asociada señora Pabón Charneco, el Juez Asociado señor Kolthoff Caraballo y el Juez Asociado señor Feliberti Cintrón.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Fredy I. Reyes Sorto, Gerardo Cerra Ortiz, Luis S. Berríos Montes, Luis Sousa Gallardo, Antonio Sanes Rosario, Edgardo Camacho García, José T. Santiago Díaz y Daniel Gómez Marrero<br><br>Apelados<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico por conducto de su Secretaria de Justicia, Honorable Wanda Vázquez Garced<br><br>Apelados<br><br>Colegio de Ingenieros y Agrimensores de Puerto Rico, por conducto de su Presidente, Ing. Pablo Vázquez Ruiz<br><br>Apelantes | AC-2021-0072 |

Opinión de conformidad emitida por el Juez Asociado señor Rivera García a la cual se une la Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Estrella Martínez

En San Juan, Puerto Rico, a 4 de mayo de 2023.

Este recurso nos brindaba la oportunidad invaluable para darle **claridad** y, sobre todo, **sentido práctico** a una parte de nuestro ordenamiento constitucional, revestida del más alto interés público. En concreto, me refiero al escrutinio aplicable a las numerosas controversias que se han suscitado y que habrán de generarse respecto a la constitucionalidad de los

mecanismos de colegiación compulsoria instaurados en nuestra jurisdicción.

De particular importancia, el caso de epígrafe nos presentó con un cuestionamiento transcendental, el cual, hasta la fecha, este Foro no había tenido la oportunidad de considerar. En términos directos, debíamos resolver si el escrutinio estricto atinente al derecho a la no asociación requiere la determinación de que el medio menos oneroso propuesto por el demandante, como alternativa a la colegiación compulsoria, representa una **alternativa viable y efectiva en comparación con el mecanismo existente**. Lo anterior, en el contexto de un esquema regulatorio dentro del cual el Estado determina delegar funciones regulatorias a un colegio profesional.

Resolver lo anterior no hubiera supuesto un menoscabo a la preeminencia del derecho a la no asociación, ni habría desvirtuado el propósito de las acciones dirigidas a su protección. Es más, le hubiera rendido un servicio mayor a la justicia, en la medida que **les hubiera asegurado a todos que su Tribunal Supremo resuelve los casos ante sí con absoluta posesión de los hechos pertinentes para una adjudicación responsable**.

No obstante, algunos compañeros rehúsan la invitación a proveerle contenido a las palabras que

comprenden el escrutinio estricto aquí aplicable. Además, desaprovechan la oportunidad para corregir ciertas malinterpretaciones que algunos letrados han hecho respecto a nuestra *Opinión* en *Rodríguez Casillas v. Colegio de Técnicos y Mecánicos Automotrices*, infra.

Para que no quede duda, ese caso **no tuvo el efecto de declarar inconstitucional todas las colegiaciones compulsorias**. No existe pronunciamiento alguno a esos efectos. Nada en nuestro ordenamiento obliga a los tribunales inferiores a tener que resolver invariablemente que cualquier colegiación compulsoria es inconstitucional. Por el contrario, la mera existencia de este escrutinio presupone que los tribunales deben ofrecer a cada pleito una mirada contextualizada y que no debe conducir automáticamente a un solo desenlace.

Por mi parte, luego de examinar los diversos argumentos que se nos han planteado, me he convencido de que es indispensable añadir un análisis de viabilidad y efectividad cuando consideremos si existe un medio menos oneroso para el profesional impugnador, como alternativa a la colegiación compulsoria.

En vista de que una Mayoría de este Tribunal no adoptó el análisis propuesto, me encuentro conteste con el dictamen que se anuncia en la *Sentencia* que emitimos. Desprovistos de un expediente que contenga toda la

prueba pertinente, carecíamos de otro curso de acción que no fuera el de revocar la determinación de los foros inferiores. En esta etapa, procede la validación del *status quo*, esto es, la constitucionalidad de la colegiación compulsoria de los ingenieros y agrimensores. Veamos los fundamentos que sostienen mi criterio.

## I

El 16 de julio de 2019 los señores Fredy Reyes Sorto, Gerardo Cerra Ortiz, Luis Berríos Montes, Luis Sousa Gallardo, Antonio Sanes Rosario, Edgardo Camacho García, José Santiago Díaz y Daniel Gómez Marrero (apelados) ——todos agrimensores licenciados—— presentaron una *Demanda* contra el Gobierno de Puerto Rico (Estado) y contra el Colegio de Ingenieros y Agrimensores de Puerto Rico (CIAPR o apelante). Según adujeron, el objeto de la reclamación judicial era impugnar la constitucionalidad de la Ley Núm. 319 de 15 de mayo de 1938, Ley del Colegio de Ingenieros y Agrimensores de Puerto Rico, *infra*, en lo atinente al requisito de colegiación compulsoria para aquellos ingenieros y agrimensores debidamente licenciados.[1] A su entender, la controversia central era si el Estado, bajo la Constitución de Puerto Rio, puede obligar a los

---

[1] Apéndice del *Certiorari*, Demanda, pág. 36.

agrimensores licenciados a pertenecer a una asociación específica, como condición para el ejercicio legal de su profesión.[2]

Oportunamente, el CIAPR contestó la demanda y alegó afirmativamente que su ley habilitadora representa un ejercicio válido del poder de razón del Estado y es constitucional.[3] Además, afirmó que el diseño regulatorio de las profesiones de la ingeniería y la agrimensura se basa en la coexistencia, delegación y descargue compartido por el Estado, vía la Junta Examinadora de Ingenieros y Agrimensores (Junta Examinadora), y el CIAPR.[4] Crucialmente, el ente colegiado sostuvo que la Junta Examinadora ——en su estructura y composición actual—— carece del personal, recursos económicos y estructura administrativa necesarios para el descargue de las funciones que le han sido delegadas al CIAPR.[5] Además, el CIAPR aludió a las funciones de carácter público que le han sido delegadas como parte de la reglamentación de la ingeniera y agrimensura.

En primer lugar, esbozó que, en la esfera ética, contrario a otros colegios profesionales, el CIAPR no se

---

[2] Íd.
[3] Apéndice del *Certiorari*, *Contestación a la Demanda*, pág. 43.
[4] Íd.
[5] Íd., pags. 43-44.

limita a referir casos éticos a la junta examinadora correspondiente.[6] Por el contrario, el CIAPR ostenta una facultad disciplinaria propia, la cual ejerce mediante su Tribunal Disciplinario y de Ética Profesional.[7]

En segundo lugar, el CIAPR expuso que su participación en el proceso de educación continuada no es la de un mero proveedor de cursos. Al contrario, alegó que el gremio implementa y administra el programa de educación continuada por delegación expresa de la Junta Examinadora.[8] Así, indicó que posee una subdivisión interna, denominada Departamento de Desarrollo Profesional y Educación Continuada, la cual establece y administra esta función.[9] Por ello, el CIAPR concluyó que, ante las realidades económicas que experimenta Puerto Rico, su función representa **no solo el medio menos oneroso para asegurar el interés apremiante del estado, sino el medio real para ello**.[10]

Posteriormente, el Estado —representado por el Departamento de Justicia en esa etapa— compareció mediante una *Moción de Sentencia Sumaria*. En esencia, argumentó que el caso se encontraba listo para ser adjudicado sumariamente, toda vez que la controversia se

---

[6] Íd., pág. 47.
[7] Íd.
[8] Íd., pág. 48.
[9] Íd.
[10] Íd.

reducía a una mera cuestión de derecho.[11] Consecuentemente, el Estado enumeró una serie de hechos materiales, los cuales entendía se encontraban incontrovertidos. A groso modo, el listado consiste en las disposiciones pertinentes de la Ley del Colegio de Ingenieros y Agrimensores de Puerto Rico, *infra*, que establecen el requisito de colegiación compulsoria como condición para el ejercicio lícito de la ingeniería y la agrimensura.[12]

En su exposición del derecho, el Estado aludió extensamente a nuestras opiniones en *Rivera Schatz v. ELA II*, 191 DPR 791 (2014) y *Rodríguez Casillas v. Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico*, 202 DPR 428 (2019). Así, razonó que no es constitucionalmente permisible que a un ciudadano se le imponga una colegiación compulsoria, en detrimento de su derecho constitucional a la libertad de asociación, salvo que se articule la existencia de un interés apremiante y se pruebe que el Estado no tiene a su alcance medidas menos onerosas para adelantar el interés articulado.[13] Consecuentemente, el Estado le solicitó al

---

[11] Apéndice del *Certiorari*, *Moción de Sentencia Sumaria*, pág. 68.
[12] Íd., págs. 68-69.
[13] Íd., pág. 76.

foro primario que dictara sentencia sumaria y dispusiera **lo que en derecho proceda**.[14]

Así las cosas, el CIAPR se opuso al petitorio del Estado y consignó su postura contra la solicitud de sentencia sumaria. En síntesis, **el CIAPR aceptó que el listado de hechos elaborados por el Estado, en efecto, correspondía a unos hechos sobre los cuales no existía controversia**.[15] No obstante, sostuvo que el referido listado no era inclusivo de todos los hechos esenciales y materiales necesarios para resolver la controversia.[16] Así, procedió a detallar quince (15) hechos adicionales, los cuales, a su entender, debían motivar la denegación de la solicitud de sentencia sumaria.

Entre los hechos elaborados, el CIAPR destacó el gasto económico que el ente destina para sus funciones éticas, el cual ascendía a $530,342.00, para el año fiscal 2017-2018.[17] Similarmente, afirmó que el costo de su función administradora del programa de educación continuada ascendía a un costo de $378,136.00, para el año fiscal 2017-2018.[18] De otra parte, el CIAPR hizo alusión a ciertas expresiones que emitiera la Junta Examinadora en ocasión de considerarse el Proyecto de la

---

[14] Íd., pág. 77.
[15] Apéndice del *Certiorari, Oposición a la "Moción de Sentencia Sumaria" del Co-Demandado Gobierno de Puerto Rico*, pág. 86.
[16] Íd.
[17] Íd., pág. 89.
[18] Íd.

Cámara 1789, allá para el 2019. En concreto, el propósito del proyecto era eliminar la colegiación compulsoria de los ingenieros y agrimensores.[19] Según adujo el CIAPR, la Junta Examinadora presentó una ponencia ante la Cámara de Representantes en la cual **concluyó que no contaba con los recursos ni la estructura organizacional para asumir las responsabilidades** ostentadas por el gremio.[20]

Consecuentemente, el CIAPR argumentó que nuestra opinión en *Rodriguez Casillas* no representaba una expresión genérica ni conceptual sobre la colegiación compulsoria en Puerto Rico.[21] Más bien, confirmó que la doctrina sobre la libertad de asociación aplica a todas las profesiones.[22] Así, señaló que la postura del Estado se reducía a sostener, sin más, que, al existir una junta examinadora, en el caso de los ingenieros y agrimensores, no procedía la colegiación compulsoria.[23] A su entender, la postura del Estado descansó en un análisis genérico y falto de contexto sobre la controversia en particular.[24]

Tras varios trámites, el Tribunal de Primera Instancia emitió una *Sentencia* mediante la cual decretó

---

[19] Íd.
[20] Íd., pags. 89-90.
[21] Íd., pág. 92.
[22] Íd.
[23] Íd., pág. 93.
[24] Íd.

la inconstitucionalidad del requisito de colegiación compulsoria de los ingenieros y agrimensores. En esencia, estimó que en este caso el CIAPR no había establecido la existencia de un interés apremiante que justifique la violación del derecho a la libertad de la asociación de los apelados.[25] A su entender, es a través de la existencia de una junta examinadora que el "Estado asegura a la ciudadanía en general que los profesionales a quienes regula, cumplen con las competencias y destrezas mínimas para su práctica profesional".[26]

Por otra parte, el foro de instancia determinó que el CIAPR tampoco había demostrado que la colegiación compulsoria fuera la medida menos onerosa para alcanzar los objetivos enunciados en la Ley del Colegio de Ingenieros y Agrimensores de Puerto Rico, *infra*. Según apuntó, el CIAPR había levantado como defensa afirmativa la importancia de dilucidar sus funciones y lo que implicaría trasferir las mismas a la Junta Examinadora.[27] En cuanto a esto, el foro primario indicó que nuestra determinación en *Rodríguez Casillas, supra*, no estuvo basada en una simple determinación sobre si la junta examinadora en cuestión podía asumir los deberes

---

[25] Apéndice del *Certiorari*, *Sentencia* del 17 de junio de 2020, pág. 63.
[26] Íd.
[27] Íd., pág. 64.

del gremio allá demandado.[28] **Así, señaló que en esa decisión no hubo determinación alguna "relacionada a un traspaso de funciones entre ambas entidades".**[29] (Énfasis suplido).

Por último, el foro primario aludió a las alegaciones que el CIAPR había levantado respecto a las dificultades fiscales y administrativas que enfrentaba la Junta Examinadora. Respecto a ello, el tribunal sentenciador concluyó que las funciones asignadas a la Junta Examinadora son exclusivas e indelegables, por lo cual el CIAPR no puede asumirlas.[30] Por tanto, el foro primario razonó que, igual como el CIAPR no podía asumir atribuciones que no le fueron delegadas por la Asamblea Legislativa, tampoco podía justificar una violación al derecho a la libertad de la asociación de los apelados **bajo una premisa de incapacidad presupuestaria.**[31]

Inconforme con este desenlace, el CIAPR acudió ante el Tribunal de Apelaciones mediante recurso de *Apelación*. En apretada síntesis, el CIAPR impugnó el manejo de este pleito por el Tribunal de Primera Instancia, en particular lo atinente a la decisión de resolver el caso sumariamente.[32] Además, el CIAPR

---

[28] Íd.
[29] Íd.
[30] Íd., pág. 65.
[31] Íd.
[32] Apéndice del *Certiorari*, *Recurso de Apelación ante el Tribunal de Apelaciones*, pág. 8.

expresó que el foro primario incurrió en una aplicación ciega y automática de lo resuelto en *Rodríguez Casillas* en abstracción de las particularidades de la colegiación compulsoria de los ingenieros y agrimensores.[33]

Tras varios tramites, el Tribunal de Apelaciones confirmó al foro primario. De entrada, el foro intermedio razonó que en este caso procedía que se dictara sentencia por la vía sumaria.[34] Lo anterior, pues los hechos adicionales presentados por el CIAPR no tuvieron el efecto de controvertir los hechos presentados por el Estado, los cuales, el propio gremio dio por incontrovertidos.[35] Además, estimó que los hechos elaborados por el CIAPR no eran indispensables para poder resolver la controversia. A su entender, se trataban de ejecutorias que el CIAPR desempeñaba, las cuales la Junta Examinadora, por su situación fiscal, presuntamente no podría asumir.[36]

Respecto al planteamiento sobre el medio menos oneroso, el foro *a quo* procedió a comparar las disposiciones estatutarias que rigen al CIAPR y la Junta Examinadora. Al cabo de ello, el tribunal intermedio concluyó que las funciones asignadas a la Junta Examinadora aseguran los más altos estándares en las

---

[33] Íd.

[34] Apéndice del *Certiorari*, Sentencia del 28 de enero de 2021, pág. 353.

[35] Íd.

[36] Íd.

profesiones de ingeniera y agrimensura.[37] Por otra parte, el Tribunal de Apelaciones estimó que el CIAPR no los convenció "de que la situación fiscal de la Junta [fuese] razón suficiente para mediante la colegiación obligatoria incidir en el derecho de libre asociación de los ingenieros y agrimensores".[38]

Así las cosas, el CIAPR acudió ante nos mediante un recurso de *Apelación*. De esta manera, el apelante le imputó al Tribunal de Apelaciones los errores siguientes:

> Erró el TA al resolver mediante Sentencia Sumaria la controversia sobre la constitucionalidad de la colegiación compulsoria de los agrimensores y los ingenieros, obviando hechos materiales adicionales presentados por el Colegio pertinentes a evaluar la viabilidad de considerar a la Junta Examinadora como una alternativa para regular la práctica de las profesiones de agrimensura e ingeniería menos onerosa a la libertad de asociación que la colegiación compulsoria, o el esquema legislativo establecido por las Leyes Número 319-1939 y 173-1988.
>
> Erró el TA al reconocer que la Asamblea Legislativa tiene un interés apremiante en regular la profesión de la ingeniería y agrimensura, para luego resolver que la Junta Examinadora es un medio menos oneroso que la colegiación compulsoria de la Ley Núm. 319-1938 para alcanzarlo, sin haber examinado y ponderado la naturaleza, efectividad y viabilidad de la alternativa asumida mediante una vista en su fondo.
>
> Erró el TA al resolver los méritos del caso aún cuando los agrimensores demandantes carecen de legitimación activa para representar los intereses del grupo de ingenieros colegiados y la sentencia

---

[37] Íd., pág. 355.
[38] Íd., pág. 356.

declaratoria perjudica derechos e intereses de los ingenieros colegiados.[39]

Oportunamente, recibimos los alegatos del Estado y los apelados. Los apelados, por su parte, reiteraron los planteamientos esbozados previamente. A su vez, el Estado expresó que "**el caso de autos conlleva unas características peculiares bajo las cuales podría sostenerse la constitucionalidad del requisito de colegiación compulsoria**".[40] (Énfasis suplido). Así, expone que la controversia podría ser distinguible al esquema examinado en *Rodríguez Casillas*, pues en el caso de autos la Asamblea Legislativa le asignó al CIAPR ciertas **facultades de carácter público** que no le fueron conferidas a la Junta Examinadora.[41] Según indica el Estado, nos corresponde resolver si la alegación de incapacidad presupuestaria y administrativa de la Junta Examinadora es un factor para considerar en el análisis sobre una alegada violación a la libertad de asociación.[42]

Posteriormente, autorizamos la comparecencia den calidad de *amicus curiae* de la Asociación de Abogados de Puerto Rico. Finalmente, el 21 de marzo de 2023,

---

[39] Este señalamiento de error fue retirado posteriormente en virtud de una *Moción Informativa sobre Planteamientos en Apelación* presentada por el CIAPR.

[40] Alegato del Estado, pág. 2.

[41] Íd., págs. 20-21.

[42] Íd., pág. 28.

celebramos una vista argumentativa en la causa de referencia.

Así las cosas, expuesto el marco procesal de este recurso, procedo a exponer los fundamentos jurídicos sobre los cuales fundamento mi posición.

## II

### A. Derecho a la asociación y la colegiación compulsoria

El derecho a la asociación surge expresamente de nuestra Constitución. Allí se preceptúa que "[l]as personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares".[43] Ciertamente, la preeminencia de este derecho en nuestra jurisdicción no se discute, pues obedece a una intención de reconocer un derecho distinto a aquel que surge de la Constitución federal.[44] El espíritu de esta disposición nos sugiere un deseo de complementar y asegurar el disfrute de los más fundamentales derechos que reconoce nuestra Carta Magna, pues "[b]ien poco significarían las libertades de conciencia, expresión y acción, si los individuos no pudiesen asociarse para hacer posible su disfrute".[45]

---

[43] Const. P.R., Art. II, Sec. 6.
[44] *Rivera Schatz v. ELA II*, 191 DPR 791, 810-11 (2014).
[45] Escuela de Administración Pública de la Universidad de Puerto Rico, *La nueva Constitución de Puerto Rico*, Río Piedras, EDUPR, 1954, págs. 224-25.

A su vez, es evidente que influyeron en la confección de esta disposición los postulados de la Declaración Universal de los Derechos Humanos de las Naciones Unidas. En el contexto histórico que se creó nuestra Constitución, la declaración aludida resultaba complementaria "a la luz de las realidades políticas, económicas y sociales" que entonces imperaban.[46] En lo pertinente, la Declaración Universal de los Derechos Humanos reconoce que (1) toda persona tiene derecho a la libertad de reunión y de asociación pacífica y (2) que nadie puede ser obligado a pertenecer a una asociación.[47]

En fiel apego a los valores que protege esta garantía constitucional, desde hace décadas este Foro reconoció que el derecho a la asociación supone necesariamente el derecho a no asociarse.[48] Al así hacerlo, hemos sido enfáticos que nuestra discusión respecto a este derecho constitucional se enmarcaba en los confines de la Constitución de Puerto Rico, como **fundamento estatal adecuado e independiente**.[49]

Ahora bien, en la historia de esta Curia no habíamos tenido oportunidad para adentrarnos en esta

---

[46] Íd., pág. 217.
[47] Art. 20, *Declaración Universal de los Derechos Humanos*, Organización de las Naciones Unidas.
[48] *Rivera Schatz v. ELA* II, supra, págs. 811-12 (citando a *Colegio de Abogados v. Schneider*, 112 DPR 540 (1982).
[49] Íd., pág. 809 (Invocando la doctrina de *Michigan v. Long*, 463 US 1032 (1983)).

área de nuestro derecho constitucional hasta años recientes, cuando emitimos nuestra *Opinión* en *Rivera Schatz v. ELA II*, supra. Allí, nos expresamos sobre el esquema de colegiación compulsoria que se le había impuesto en nuestra jurisdicción a los abogados. Amparados **exclusivamente en nuestro poder inherente para reglamentar la profesión legal**, declaramos inconstitucionales ciertas disposiciones de la Ley Núm. 109-2014, las cuales habían reestablecido la colegiación compulsoria de los letrados.[50]

Fue nuestro criterio que la reimposición de la colegiación compulsoria a los abogados representaba una intromisión inconstitucional en la esfera delegada a este Tribunal por nuestra Carta Magna.[51] Además, estimamos, que como Foro rector poseíamos las herramientas necesarias para salvaguardar el buen funcionamiento de la justicia en Puerto Rico.[52] Al evaluar la improcedencia del esquema de colegiación compulsoria de la profesión legal, indicamos que "los abogados son un grupo de profesionales sui géneris que, *contrario a otros grupos profesionales*, están fiscalizados por un ente permanente que los regula de

---

[50] Íd., pág. 795.
[51] Íd., pág. 821.
[52] Íd.

manera independiente a cualquier grupo profesional o colegio".[53] (Bastardillas en el original).

Ahora bien, como parte de nuestra exposición del derecho, también nos expresamos sobre las imbricaciones constitucionales del requerimiento de asociación a una organización, como precondición para ejercer una profesión.[54] Ya en *Colegio de Abogados v. ELA*, 181 DPR 135, 137 (2011), mediante *Resolución*, habíamos adelantado que "es **la colegiación compulsoria** de una clase profesional la que **crea una fricción inevitable con la libertad de asociación de los afectados**. Por ello, esa limitación significativa de la libertad a no asociarse es constitucional solamente si el Estado demuestra un interés gubernamental apremiante que la hace necesaria".[55] (Énfasis suplido). Así, en *Rivera Schatz v. ELA II*, reconocimos que una medida que incida sobre este derecho fundamental deberá representar no solamente un interés apremiante del Estado, sino que debe ser un **medio menos oneroso** para la consecución de ese fin.[56]

Posteriormente, este Foro tuvo una segunda ocasión para atender una controversia sobre un esquema de colegiación compulsoria en *Rodríguez Casillas v. Colegio*

---

[53] Íd., págs. 816-17.
[54] *Rivera Schatz v. ELA II*, *supra*, pág. 809.
[55] *Colegio de Abogados v. ELA*, 181 DPR 135, 137 (2011).
[56] *Rivera Schatz v. ELA II*, *supra*, pág. 813.

*de Técnicos y Mecánicos Automotrices de Puerto Rico*, 202 DPR 428 (2019). Allí, resolvimos que nuestra discusión en *Rivera Schatz v. ELA II, supra,* sobre el derecho a la no asociación, era extensiva a otras profesiones.[57] Acertadamente, afirmamos que concluir lo contrario resultaría en un estado de derecho donde los demás profesionales, frente al Estado, tienen menos derechos que los abogados.[58] Consecuentemente, reiteramos que cualquier actuación estatal que interfiriera con el ejercicio del derecho a la asociación debería sobrepasar, para su validez, un escrutinio constitucional estricto.[59] Ello, presupone la existencia de un interés apremiante que haga la actuación necesaria y que el Estado no tenga a su alcance medidas menos onerosas para lograr el interés articulado.[60]

Según concluimos, **en el contexto particular de los técnicos y mecánicos automotrices**, aunque existía un interés apremiante del Estado, la colegiación compulsoria no era el medio menos oneroso.[61] Así, recurrimos a un análisis detallado de las disposiciones que crearon la Junta Examinadora de Técnicos y Mecánicos Automotrices y el Colegio de Técnicos y Mecánicos

---

[57] *Rodríguez Casillas v. Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico*, 202 DPR 428, 451 (2019).

[58] Íd.

[59] Íd., pág. 449-450.

[60] Íd., pág. 450.

[61] Íd., pág. 452.

Automotrices de Puerto Rico. Al examinar las funciones particulares de esa junta examinadora, encontramos que se encontraba facultada para

> ofrecer exámenes, expedir, suspender y revocar las licencias de técnico y mecánico automotriz, adoptar reglamentos para su implementación e investigar a los técnicos y mecánicos por violaciones a esta ley y los reglamentos expedidos por la Junta Examinadora. Así también, en virtud de su facultad para adoptar reglamentos, promulga reglas para asegurar la calidad de la educación continua obligatoria.[62]

A su vez, las funciones pertinentes del Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico eran las de adoptar y velar porque se cumplan los cánones de ética; recibir e investigar querellas, las cuales, de encontrarse causa fundada, se remitirían a la Junta Examinadora de Técnicos y Mecánicos Automotrices; y para proteger a sus miembros en el ejercicio de su oficio y socorrer aquellos que se retiren por inhabilidad física o edad avanzada.[63] Al comparar estas disposiciones, estimamos que sería mediante el buen ejercicio de las facultades delegadas a esa junta examinadora que se lograrían mantener estándares altos en esa profesión.[64]

Merece resaltar, que el compañero Juez Asociado señor Estrella Martínez emitió unas expresiones concurrentes, que hoy resultan en extremo pertinentes.

---

[62] Íd.
[63] Íd., pág. 446.
[64] Íd., pág. 452.

Según apuntaló, era "necesario enfatizar que el esquema de colegiación compulsoria invalidado en este *caso particular* no necesariamente corresponde a la realidad de las profesiones restantes en Puerto Rico".[65] (Énfasis en el original). Lo anterior, pues la regulación de las diversas profesiones es un asunto que **no puede tratarse homogéneamente**.[66]

Más recientemente, este Tribunal tuvo ocasión para considerar una tercera impugnación a una medida de colegiación compulsoria en *Colegio de Médicos Veterinarios de Puerto Rico v. Veterinario Express*.[67] Mediante nuestras respectivas *Opiniones*, tanto la Jueza Presidenta Oronoz Rodríguez y yo, consignamos nuestras posturas sobre la necesidad de que estas controversias sean dilucidadas dentro de un marco de atención a las particularidades de las distintas profesiones.

### B. Viabilidad del medio menos oneroso

Sabido es que el escrutinio estricto es la vara al amparo de la cual se miden los esquemas de colegiación

---

[65] Íd., pág. 457. (Expresión concurrente, J. Estrella Martínez).

[66] Íd.

[67] *Colegio de Médicos Veterinarios de Puerto Rico v. Veterinario Express*, 2022 TSPR 113, 210 DPR ___ (2022). Véanse, (Opinión concurrente, J. Rivera García) ("[L]a evaluación de la constitucionalidad de un sistema de colegiación compulsoria debe adjudicarse caso a caso, acorde con las circunstancias particulares de cada profesión"); (Opinión disidente, J. Oronoz Rodríguez a la cual se unió el J. Estrella Martínez) ("Los casos que atienden la colegiación compulsoria de las distintas profesiones ameritan resolverse según sus circunstancias").

compulsoria. Acorde con ello, la colegiación compulsoria de una profesión u oficio solo puede prevalecer cuando el proponente de esta haya logrado establecer dos (2) elementos, a saber: (1) un interés apremiante del Estado y (2) **que la colegiación compulsoria constituya el medio menos oneroso para adelantar el interés esbozado**.[68]

Ahora bien, al examinar el escrutinio estricto que hemos requerido en estos casos, encuentro una ausencia de pautas respecto a lo que deben exhibir los medios menos onerosos que se sostengan como alternativa a la colegiación compulsoria. Ciertamente, **no hemos reconocido este elemento en el escrutinio estricto como una mera formalidad**. Siendo así, puesto que no nos hemos expresado sobre este particular, precisaba aclarar lo que implica, en términos prácticos, que exista o no un medio menos oneroso a un esquema de colegiación compulsoria. Con el fin de enriquecer la discusión al respecto, recurro a otras controversias de índole constitucional en las cuales este Foro o la Corte Suprema federal, han tenido ocasión para expresarse sobre el concepto del medio menos oneroso.

Para fines persuasivos, comenzamos examinando ciertas expresiones que ha emitido la Corte Suprema

---

[68] Véanse, *Rodríguez Casillas v. Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico*, 202 DPR 428, 449-450 (2019); *Rivera Schatz v. ELA II*, 191 DPR 791, 813 (2014).

federal sobre este particular. En *U.S. v Playboy Entertainment Group, Inc.*, 529 US 802 (2000), en el contexto de una restricción por contenido a la libertad de expresión, el Máximo Foro federal determinó que el estándar de revisión aplicable era el escrutinio estricto.[69] Así, expresó que uno de los elementos a considerar era si el Estado contaba con una alternativa menos restrictiva para cumplir su propósito.[70] El objetivo de este elemento es sencillo, **si el gobierno dispone de un medio menos restrictivo debe utilizarlo**.[71]

Ahora bien, al considerar el medio menos oneroso propuesto, la Corte Suprema Federal entendió pertinente preguntarse **si este sería efectivo**.[72] Así, de ofrecerse una alternativa **plausible y menos restrictiva**, es la obligación del Estado **probar que esa alternativa sería inefectiva** en la consecución del interés adelantado.[73]

Más recientemente, en el contexto de la libertad religiosa, la Corte Suprema federal nuevamente tuvo que considerar los elementos del escrutinio estricto. Ante una impugnación a un mandato federal para que las empresas proveyesen a sus empleados coberturas de salud que incluyeran ciertos métodos anticonceptivos, el Máximo Foro federal entendió que era de aplicación el

---

[69] Íd., pág. 814.
[70] Íd., pág. 815.
[71] Íd.
[72] Íd., pág. 816.
[73] Íd.

escrutinio estricto según concebido en el *Religious Freedom Restorarion Act*.[74] Así, surge la necesidad de que la actuación impugnada constituya el medio menos oneroso para adelantar el interés apremiante aducido.[75]

Resulta interesante que en su análisis la Corte Suprema federal procedió a considerar las alternativas al esquema legal examinado. Como parte de ello, se consideró la posibilidad de que el Gobierno Federal sufragara el costo de los medios anticonceptivos allí objetados.[76] Al ponderar esto, se concluyó que esa alternativa en efecto sería menos restrictiva *vis a vis* la libertad religiosa de los demandantes y que **el Estado no había demostrado que no fuera viable**.[77] Posteriormente, en respuesta a los planteamientos del Estado, respecto al efecto presupuestario de dicha alternativa propuesta, se despacharon los mismos al enumerar que, si bien **el costo pudiese ser un factor importante en el análisis del medio menos oneroso**, en ese caso, el gobierno pudiese estar obligado a asumir ciertos costos adicionales para acomodar las creencias religiosas afectadas.[78]

---

[74] *Burwell v. Hobby Lobby Stores, Inc.*, 573 US 682, 726 (2014).
[75] Íd.
[76] Íd., pág. 728.
[77] Íd.
[78] Íd., pág. 730. Véase texto original, "**[w]e do not doubt that cost may be an important factor in the least-restrictive-means analysis**, but both RFRA and its sister statute, RLUIPA, may in some

Ahora bien, este Foro tampoco ha sido ajeno a la discusión de estos temas. Hace menos de diez (10) años, en *Trinidad Hernández v. ELA*, 188 DPR 828 (2013), evaluamos la procedencia de una reforma al Sistema de Retiro, al amparo de la cláusula contra el menoscabo de obligaciones contractuales de nuestra Constitución. En ese caso, el escrutinio aplicable partía de la premisa de que una modificación a una obligación pública solo superaría el escollo constitucional si persigue un interés importante en beneficio del bienestar general y si esta es necesaria y razonable para adelantar ese interés.[79] Crucialmente, expresamos que "**no se sostendrá el menoscabo de una obligación contractual si la parte demandante demuestra que existen alternativas menos drásticas o severas** que las que el legislador escogió para lograr su objetivo".[80] (Énfasis suplido). No obstante, los allí demandantes se habían limitado a señalar —**de forma generalizada**— que existían alternativas menos onerosas, **sin detallar cómo estas se llevarían a cabo** y asegurarían la solvencia del Sistema de Retiro.[81] Así, fue nuestro criterio que los demandantes no demostraron "evidencia para convencer al

---

circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs). (Énfasis suplido).

[79] Íd., pág. 836.

[80] Íd., pág. 837.

[81] Íd., págs. 837-38.

tribunal en un juicio **que estas alternativas son viables y menos onerosas**".[82] (Énfasis suplido).

   C. **Ley de la Junta Examinadora de Ingenieros, Arquitectos, Agrimensores y Arquitectos Paisajistas de Puerto Rico y sus reglamentos**

El estatuto rector de las profesiones de la ingeniería y la agrimensura en nuestra jurisdicción es la Ley de la Junta Examinadora de Ingenieros, Arquitectos, Agrimensores y Arquitectos Paisajistas de Puerto Rico.[83] Dispone esta ley, que toda persona que ejerza u ofrezca ejercer las profesiones de ingeniero, arquitecto, agrimensor o arquitecto paisajista deberá presentar evidencia de que está autorizada a ejercer dichas profesiones, que se encuentra inscrito en el Registro de la Junta Examinadora y que es miembro activo de los respectivos colegios profesionales.[84] Según consigna la ley, el interés de dicho requisito es **"proteger la vida, la salud y la propiedad, y para fomentar el bienestar público en general**".[85] (Énfasis suplido).

A tenor con este fin legislativo, el estatuto crea la Junta Examinadora de Ingenieros y Agrimensores (Junta Examinadora), la cual deberá estar adscrita al

---

[82] Íd., pág. 838.
[83] Ley Núm. 173 de 12 de agosto de 1988, según enmendada, 20 LPRA sec. 711 et seq.
[84] 20 LPRA sec. 711.
[85] Íd.

Departamento de Estado del Gobierno de Puerto Rico.[86] Además, inviste a dicho ente con ciertas facultades reguladoras. Entre estas, para

> **adoptar y promulgar cualesquiera reglas y reglamentos que estime necesarios para la implantación de esta Ley**; para el cumplimiento de sus deberes bajo la misma; para establecer la forma y manera, para **evaluar de manera uniforme la experiencia de los profesionales en entrenamiento** que soliciten certificación por experiencia como ingenieros o agrimensores asociados, según sea el caso; para **establecer aquellos requisitos de educación profesional continuada** que estimen necesarios para la renovación de licencias o certificados profesionales; y para **establecer los procedimientos para la tramitación de asuntos**, siempre y cuando estas reglas y reglamentos no sean incompatibles con las Leyes vigentes y la Constitución del Estado Libre Asociado de Puerto Rico y las leyes y tratados aprobados por los Estados Unidos de América.[87] (Énfasis suplido).

También, la Junta Examinadora tiene autoridad para denegar, suspender, revocar o cancelar cualquier licencia o certificación a un aspirante o titular de esta.[88] Entre los fundamentos que la ley reconoce para este tipo de curso de acción se encuentran, entre otros: (1) incurrir en fraude o engaño para lograr inscripción en los registros de la Junta; (2) ser encontrado incurso en violaciones a los Cañones de Ética Profesional del Colegio de Ingenieros y Agrimensores de Puerto Rico o en violaciones a las ley bajo la cual fue creada dicha institución; (3) negligencia crasa, incompetencia o incurrir en conducta reprochable en el ejercicio de la

---

[86] 20 LPRA sec. 711c.
[87] 20 LPRA sec. 711c-2.
[88] 20 LPRA sec. 711n.

profesión e (4) incurrir en fraude o engaño en el ejercicio de su profesión o convicción por delito grave o menos grave que implique depravación moral.[89]

De otra parte, la Junta Examinadora, a iniciativa propia o mediante querella fundamentada, podrá formular cargos contra cualquier ingeniero o agrimensor que violente las disposiciones de su ley habilitadora o sus reglamentos.[90] Cabe resaltar, que el Artículo 36 de dicha ley **exige que la Junta Examinadora incorpore** en su reglamento, y haga cumplir cuando fuera llamado a ello, **los Cánones de Ética Profesional adoptados por el Colegio de Ingenieros y Agrimensores de Puerto Rico**.[91]

A tenor con la autoridad que se le ha conferido en ley, la Junta Examinadora ha promulgado dos (2) reglamentos. En primer lugar, encontramos el Reglamento de la Junta Examinadora de Ingenieros y Agrimensores de Puerto Rico.[92] Este reglamento incluye disposiciones detalladas respecto a la administración de exámenes de revalida,[93] la concesión y renovación de licencias y certificados,[94] y el procedimiento para celebrar vistas públicas o administrativas.[95]

---

[89] Íd.

[90] 20 LPRA sec. 711q.

[91] 20 LPRA sec. 711z.

[92] Reglamento de la Junta Examinadora de Ingenieros y Agrimensores de Puerto Rico, Reglamento Núm. 7749 del Departamento de Estado, 23 de septiembre de 2009.

[93] Art. IV, *Procedimiento de Examen*, pág. 12.

[94] Art. V, *Otorgamiento de Certificados, Licencias y Certificación de Experiencia*, pág. 19.

[95] Art. VIII, *Procedimientos*, pág. 30.

En la esfera ética, el Artículo VI de este reglamento recalca la obligación que tiene la Junta Examinadora de adoptar los Cánones de Ética Profesional aprobados por el Colegio de Ingenieros y Agrimensores de Puerto Rico.[96] Más aún, la disposición expone que

> [e]n el caso de **querellas por violaciones éticas radicadas ante la Junta** por ciudadanos particulares o por agencias del Gobierno, **la Junta las referirá prontamente al Colegio de Ingenieros y Agrimensores de Puerto Rico para ser vistas en primera instancia por el Tribunal Disciplinario y de Ética Profesional de dicho Colegio**, en deferencia a las prerrogativas para la evaluación de la conducta ética de sus miembros que le otorga al Colegio la Ley 319 del 15 de mayo de 1938, según enmendada.[97] (Énfasis suplido).

Por otro lado, la Junta Examinadora también promulgó el Reglamento de Educación Continuada de los Ingenieros y Agrimensores.[98] El mismo busca "establecer guías y normas" para regular el ofrecimiento de educación continuada en las profesiones de ingeniería y agrimensura, "con el fin de mantener al día los conocimientos y destrezas necesarias para que los profesionales ofrezcan un servicio de excelencia que beneficie a toda la comunidad".[99] En virtud de la autoridad que posee la Junta Examinadora, "se requiere la participación o presentación en actividades cualificadas, a todo profesional incluido en este

---

[96] Art. VI, *Código de Ética*, pág. 30.
[97] Íd.
[98] Reglamento de Educación Continuada de los Ingenieros y Agrimensores, Reglamento Núm. 6575 del Departamento de Estado, 28 de enero de 2003.
[99] Art. I, *Disposiciones Generales*, pág. 1.

Reglamento como condición para renovar licencias o certificados".[100]

Es así como el referido Reglamento establece que "la Junta tiene la autoridad final para cualificar las actividades. **Sin embargo, delega en el Colegio la evaluación, asignación y acreditación de cualquier actividad**".[101] (Énfasis suplido). Acto seguido, la Junta Examinadora detalla las **funciones que se le han delegado al Colegio de Ingenieros y Agrimensoras de Puerto Rico.** Estas son las siguientes:

    (A)    Establecer y administrar el Registro de sus Profesionales para asegurar y facilitar el cumplimiento de los requisitos de Educación Continua y Desarrollo Profesional establecidos en este Reglamento.

    (B)    Crear y administrar un Sistema de Evaluación de Proveedores Certificados de Educación Continua para sus respectivas profesiones. Los criterios para la evaluación de proveedores deben tener la aprobación de la Junta. La Junta, en coordinación con el Colegio de Ingenieros y Agrimensores, mantendrá un Registro de los proveedores certificados.

    (C)    Establecer departamentos de Desarrollo Profesional y Educación Continua capaces de dar seguimiento y facilitar el cumplimiento de este Reglamento.

    (D)    Informar a la Junta sobre cumplimiento del profesional en términos de horas de contacto en Educación Continua.[102]

---

[100] Art. IV, *Requisitos*, pág. 3.
[101] Art. V, *Acreditación y Autoridad Final*, pág. 7.
[102] Art. VI, *Funciones del Colegio*, págs. 7-8.

### D. Ley del Colegio de Ingenieros y Agrimensores de Puerto Rico

El Colegio de Ingenieros y Agrimensores de Puerto Rico (CIAPR) tiene su origen en la aprobación de su ley constitutiva por nuestra Asamblea Legislativa en el año 1938.[103] En virtud de dicho mandato, se constituyó a los profesionales con derecho a ejercer las profesiones de ingeniería y agrimensura en una entidad jurídica, de naturaleza cuasi pública.[104] De esta manera, se revistió al CIAPR con las facultades que nuestro ordenamiento suele reconocerle a las personas jurídicas.[105]

Ahora bien, destacamos dos (2) facultades muy particulares que la ley le reconoce al CIAPR. En primer lugar, el gremio tiene autoridad "[p]ara adoptar o implantar los cánones de ética profesional que regirán la conducta profesional de los ingenieros y agrimensores **los cuales serán incorporados en el Reglamento de la Junta Examinadora de Ingenieros y Agrimensores de Puerto Rico**".[106] (Énfasis suplido). Lo anterior, en sintonía con las disposiciones que rigen la Junta Examinadora.

De otra parte, el CIAPR ostenta ciertas facultades disciplinarias autóctonas. Así, queda capacitado "[p]ara recibir e investigar las quejas que se formulen respecto a la conducta de los miembros en ejercicio de la

---

[103] Véase, Ley Núm. 319 de 15 de mayo de 1938, según enmendada, 20 LPRA sec. 731 et seq.
[104] 20 LPRA sec. 731.
[105] 20 LPRA sec. 732.
[106] Íd.

profesión, teniendo la oportunidad de remitirlas a la Junta de Gobierno para que actúe".[107] En virtud de este poder, el CIAPR, luego de celebrado el procedimiento correspondiente, podrá decretar las sanciones pertinentes, lo que incluye la suspensión de un colegiado.[108]

En los casos que conlleven la suspensión de un colegiado, el CIAPR deberá instituir el correspondiente proceso de cancelación o suspensión de la licencia ante la Junta Examinadora. Según expresa la propia ley, la consecuencia de una suspensión decretada por el CIAPR es que el colegiado **"no podrá practicar la profesión durante el periodo que dure la suspensión"**.[109] (Énfasis suplido). No obstante, huelga aclarar, que estas facultades no limitan o alteran en forma alguna la autoridad de la Junta Examinadora **para iniciar por su propia cuenta un procedimiento disciplinario**.[110]

Finalmente, la Sección 3 establece el requisito de la colegiación compulsoria en las profesiones de la ingeniería y la agrimensura. A esos efectos, ninguna persona, que no sea colegiado, podrá ejercer estas profesiones en Puerto Rico.[111] Por ende, para mantener su estatus de colegiado, un ingeniero o agrimensor deberá

---

[107] Íd.
[108] Íd.
[109] Íd.
[110] Íd.
[111] 20 LPRA sec. 733.

pagar la cuota que el CIAPR disponga.[112] La consecuencia de un impago es su suspensión como colegiado.[113]

### E. Sentencia Sumaria

Es harto conocido que nuestro ordenamiento procesal civil reconoce el uso y valor del mecanismo de la sentencia sumaria como vehículo para asegurar la solución justa, rápida y económica de un caso.[114] Tal herramienta posibilita la pronta resolución de una controversia cuando no se requiera la celebración de un juicio en su fondo. Ahora bien, para que proceda este mecanismo es necesario que de los documentos no controvertidos surja que no hay un controversia real y sustancial sobre los hechos del caso.[115] Puesto de otra manera, que solo resta aplicar el derecho.[116] Según hemos expresado, un hecho material "es aquel que puede afectar el resultado de la reclamación de acuerdo al derecho sustantivo aplicable".[117] Para que exista una controversia sobre los hechos, esta debe ser real, es decir, cualquier duda es insuficiente para derrotar una moción de sentencia sumaria.[118]

---

[112] 20 LPRA sec. 739.
[113] 20 LPRA sec. 740.
[114] Véanse, *Meléndez González v. M. Cuebas*, 193 DPR 100 (2015); *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414 (2013); *Ramos Pérez v. Univisión*, 178 DPR 200 (2010).
[115] *Ramos Pérez v. Univisión*, supra, pág. 214.
[116] Íd.
[117] *Meléndez González v. M. Cuebas*, supra, pág. 110; *Ramos Pérez v. Univisión*, supra, pág. 213.
[118] *Ramos Pérez v. Univisión*, supra, págs. 213-14.

Por su parte, la Regla 36 de Procedimiento Civil,[119] la cual estatuye el mecanismo de la moción de sentencia sumaria, exige ciertos requisitos de forma para la moción que se inste y su respectiva oposición. Así, la parte que sostenga que "la inexistencia de una controversia sustancial de hechos esenciales y pertinentes" debe presentar una moción que se funde en declaraciones juradas u otra evidencia admisible.[120]

Además, tanto la moción como su oposición deben presentar

> una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal.[121]

Finalmente, si el cúmulo de la evidencia anejada demuestra que en efecto no hay controversia sustancial en cuanto algún hecho esencial y pertinente, el tribunal deberá dictar sentencia sumaria si procede como cuestión de derecho.[122] Por ende, el tribunal no deberá dictar sentencia sumaria: (1) existan hechos esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no han sido refutadas; (3) surja una controversia real sobre algún hecho esencial o material

---

[119] 32 LPRA Ap. V, R. 36.1.
[120] Íd.
[121] 32 LPRA Ap. V, R. 36.3.
[122] Íd.

de los propios documentos que acompañan la moción, o (4) no procede como cuestión de derecho.[123]

### III

Según intima el CIAPR en su primer señalamiento de error, los foros recurridos erraron al aplicar a estos hechos el mecanismo de la sentencia sumaria, pese a sus alegaciones de que aquí existían hechos adicionales y materiales que no fueron considerados por los tribunales inferiores. De este modo, la controversia se reduce a si el foro primario y el foro intermedio erraron al entender que no existían hechos adicionales y materiales que evitaran que este caso pudiese ser resuelto por la vía sumaria.

Bien entendido, el CIAPR no controvirtió el petitorio de sentencia sumaria del Estado y, por ende, no puso al foro primario en condición de rechazar ese curso decisorio para el caso. Ciertamente, no es necesario que el tribunal sentenciador considere todos los hechos que las partes le planteen en una moción de sentencia sumaria y su correspondiente oposición. Lo que no es menos cierto, es que **un tribunal nunca puede hacer caso omiso a un factor pertinente a la controversia al**

---

[123] *Reyes Sánchez v. Eaton Electrical*, 189 DPR 586, 595. (2013).

**momento de adjudicar**. Esto, precisamente, fue lo que aquí ocurrió.

Como hemos adelantado, el elemento esencial en esta controversia surge del segundo señalamiento de error que planteó el CIAPR. Esto es, que en su determinación **los tribunales recurridos rehusaron considerar, como elemento pertinente, la viabilidad del medio menos oneroso** aducido como alternativa a la colegiación compulsoria. Luego de ponderar este aspecto, <u>**coincido plenamente con el CIAPR.**</u>

Nuestra doctrina en el ámbito de la colegiación compulsoria consigna su fricción inevitable con el derecho constitucional a la asociación. A tales efectos, un esquema de colegiación compulsoria, que sea impugnado al amparo de esta disposición garante, deberá superar un escrutinio estricto. Tal escrutinio, recabamos, exige dos elementos: (1) la presencia de un interés apremiante del Estado y (2) la existencia de un medio menos oneroso para adelantar el interés aducido. En este caso, no existe controversia de que el interés apremiante existe y ha sido articulado según exige el escrutinio. Partiendo de ello, resta auscultar el segundo aspecto del escrutinio.

La postura del CIAPR en este tema ha sido consistente. Desde un inicio, su posición es que la

Junta Examinadora no posee los recursos para asumir las funciones independientes que el esquema legislativo le ha conferido al gremio. Es decir, sostienen que **su naturaleza no es la de un ente que meramente complementa y auxilia a la Junta Examinadora.**

Por el contrario, su argumento esencial es que el requisito de colegiación compulsoria sostiene, a su vez, un esquema regulatorio que precisa de la participación de tanto el CIAPR y la Junta Examinadora. Bajo este supuesto, la eliminación del requisito de la colegiación compulsoria, sin considerar la idoneidad de la Junta Examinadora para asumir lo actualmente efectuado por el CIAPR, pondría en riesgo el interés apremiante que tiene el Estado. Nuevamente, **coincido.**

Examinado el expediente, encuentro varios factores que me mueven a coincidir con la postura antes descrita. De entrada, resultan altamente ilustradoras ciertas expresiones emitidas por la propia Junta Examinadora en cuanto a este tema. Como indicara el CIAPR en su oposición a sentencia sumaria, la Junta Examinadora expuso, ante la Cámara de Representantes, que **no se encuentra habilitada <u>presupuestaria</u> y <u>organizacionalmente</u> para asumir las funciones separadas que ostenta el CIAPR.**

En lo pertinente, el Proyecto de la Cámara 1789 había propuesto la eliminación del requisito de colegiación compulsoria y la eliminación de aquellas funciones independientes que el CIAPR ostentaba respecto al esquema reglamentario de la ingeniería y agrimensura.[124] La **Junta Examinadora compareció en oposición a dicha medida propuesta** y expresó que "[l]as enmiendas propuestas le quitan facultades al CIAPR y las asigna a la Junta Examinadora de Ingenieros y Agrimensores de Puerto Rico, **sin tomar en consideración las consecuencias que puedan afectar al país y a la ciudadanía**".[125] (Énfasis suplido).

Respecto a las facultades disciplinarias que ostenta, esbozó que **"lo único que hace la Junta Examinadora** […] al recibir querellas de la ciudadanía, de la Oficina del Contralor o de otros colegiados por violaciones a los Cánones de Ética Profesional **es referirlas al CIAPR** […] por no tener jurisdicción ni la organización para investigarlas y procesarlas".[126] (Énfasis suplido). En su opinión, la Junta Examinadora no cuenta **"con los recursos humanos y económicos ni con la estructura organizacional para asumir la**

---

[124] Véase, P. de la C. 1789, 18va Asamblea Legislativa, 4ta Sesión Ordinaria.

[125] Apéndice del *Certiorari*, *Ponencia de la Junta Examinadora de Ingenieros y Agrimensores de Puerto Rico (JEIAPR) sobre el Proyecto P. de la C. 1789, para Eliminación de Colegiación Compulsoria a Ingenieros y Agrimensores*, pág. 210.

[126] Íd., págs. 210-11.

**responsabilidad de poner en ejecución los Cánones de ética Profesional, recibir, investigar y procesar las querellas** relacionadas".[127] (Énfasis suplido).

A su vez, la Junta Examinadora estimó que la eliminación de las funciones delegadas al CIAPR serían contrarias a las determinaciones tomadas por la propia Junta y el Departamento de Estado.[128] Lo anterior pues, nuevamente, **adujo que no contaba con recursos o estructura para asumir las funciones delegadas** en esa área. En sus palabras, "nuestra Junta Examinadora **no cuenta con los recursos para establecer una organización eficiente como la existente y que fue creada por delegación** de la JEIAPR".[129] (Énfasis suplido).

Por otra parte, un análisis sosegado de las disposiciones que rigen a estas profesiones nos convence que estamos ante una situación que presenta cuestionamientos válidos sobre las alternativas propuestas al sistema vigente. **No era correcto que los foros inferiores hicieran caso omiso a estos planteamientos.** Con gran sentido de responsabilidad, no podíamos soslayar la idoneidad de esta ocasión para impartirle mayor claridad al escrutinio que han de emplear los tribunales en estos casos.

---

[127] Íd., pág. 212.
[128] Íd.
[129] Íd., pág. 213.

La determinación que un tribunal pueda tomar en estos casos requiere de la consideración de factores adicionales a los que fueron examinados en este pleito. Sin duda, **los tribunales no nos debemos limitar a una consideración abstracta de las alternativas propuestas.** Cuando se impugne una colegiación compulsoria es necesario considerar detenidamente la prueba sobre las facultades de las entidades que regulan una profesión.

**Resolver lo contrario no abre en forma alguna la puerta para que los foros judiciales nos inmiscuyamos indebidamente en la esfera delegada a otro poder constitucional.** No obstante, el Poder Judicial —garante y máximo intérprete de nuestra Carta Magna— viene llamado a adjudicar con rectitud y conciencia. Para ello, debemos encontrarnos en una posición informada previo a disponer. No sería posible hacer lo propio sin considerar toda la prueba pertinente.

Ante una impugnación a un requisito de colegiación compulsoria, los tribunales debemos exigir, como ha sido la regla, que el proponente de la colegiación compulsoria supere el escrutinio estricto. Ahora bien, **para determinar que existe un medio menos oneroso, sostengo que los tribunales deben considerar la viabilidad de las alternativas propuestas.**

Requerir lo anterior no revierte, como sugieren algunos de mis compañeros de estrado, el peso de la prueba en estos pleitos. Más bien, añade una continuación lógica al flujo procesal. Es decir, el demandante plantea la inconstitucionalidad de la medida y la existencia concreta de un medio menos oneroso. El demandado contesta y sostiene que el medio menos oneroso es el existente, pues el propuesto no es viable. Ante eso, habiendo el proponente descargado su deber probatorio, restaría que el demandante replique si así lo entiende propio. Posterior a ello, el Tribunal vendría llamado a resolver.

Al así hacerlo, soy del parecer que el foro primario debería considerar una gama de factores, los cuales, desde luego, deberían contextualizarse dentro de la idiosincrasia de cada profesión y su esquema regulatorio. Al considerar la prueba, el tribunal deberá prestar atención a elementos tales como: **(1) factores presupuestarios, (2) la delegación de facultades por mandato estatuario o reglamentario, (3) la disponibilidad de suficiente capital humano, entre otros.** Todo esto, y más, debe formar parte del análisis sobre la viabilidad del medio menos oneroso.

Es solo a través del análisis de todo posible factor que incida sobre la viabilidad del método

propuesto como el menos oneroso, no solo aquellos de naturaleza meramente presupuestaria, que el tribunal estará en posición de efectuar el escrutinio estricto de forma más cabal. De esta forma, se garantiza que el Estado descargue su responsabilidad de demostrar que el esquema legislativo vigente es el menos oneroso y se evita la aplicación autómata del análisis del escrutinio estricto sin consideración ulterior a la viabilidad del mecanismo alterno.

**IV**

Lamentablemente, no pudimos obtener una mayoría para con el análisis propuesto. Seguiré apostando en ocasiones futuras hacia la posibilidad de que este Tribunal pueda adoptar, mayoritariamente, el análisis que exige la evaluación de estos casos.

Creo firmemente que un dictamen judicial bien fundamentado es uno de los cimientos de un sistema judicial garante y, sobre todo, responsable. Todos los días los tribunales quedamos confrontados con casos que pueden ser complejos y requerir el balance de intereses, muchas veces en extremos opuestos.

Frecuentemente, estas controversias entrañan asuntos que van a los más profundo del ser humano, su conciencia. No obstante, en una sociedad como la nuestra, los tribunales venimos llamados a ejercer una

delicada función a fin de que podamos reconciliar los derechos fundamentales del individuo con el interés de una sociedad ordenada y en la cual existan salvaguardas para la protección pública.

En esa faena, es de particular importancia que reafirmemos nuestro deber cuando los casos ante nos presentan controversias cuyo significado se extrapola más allá de los meros hechos. En este caso, lo justo era resolver la aplicabilidad de la metodología propuesta. No siendo ese el resultado, procede sostener el esquema vigente, dentro del cual existe un requisito de colegiación compulsoria de los ingenieros y agrimensores.

Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Fredy I. Reyes Sorto, Gerardo Cerra Ortiz, Luis S. Berríos Montes, Luis Sousa Gallardo, Antonio Sanes Rosario, Edgardo Camacho García, José T. Santiago Díaz y Daniel Gómez Marrero<br><br>    Apelados<br><br>        v.<br><br>Estado Libre Asociado de Puerto Rico, por conducto de su Secretaria de Justicia, Honorable Wanda Vázquez Garced<br><br>    Apelado<br><br>Colegio de Ingenieros y Agrimensores de Puerto Rico, por Conducto de su presidente, Ing. Pablo Vázquez Ruiz<br><br>    Apelantes | AC-2021-0072 |

Opinión de Conformidad emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 4 de mayo de 2023.

El requisito de colegiación compulsoria que se exige en nuestro País, como condición para ejercer determinadas profesiones, es una medida de protección social. El mismo, a todas luces, puede co-habitar en nuestro ordenamiento jurídico con el derecho constitucional a la libre asociación. **Como se explicará mas adelante, uno no cancela al otro.**

Así las cosas, al no existir en este Tribunal los votos que exige la Constitución del Estado Libre Asociado de Puerto Rico para sentenciar lo contrario, estamos conformes con el curso de acción seguido por esta Curia en el día de hoy. Art. V, Sec. 4, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 427. Veamos.

I.

Los hechos medulares que dan margen al presente litigio no están en controversia. Allá para el 16 de julio de 2019, el Sr. Fredy Reyes Sorto, y otros, presentaron ante el Tribunal de Primera Instancia una *Demanda* de sentencia declaratoria en contra del Estado Libre Asociado de Puerto Rico (en adelante, "ELA") y del Colegio de Ingenieros y Agrimensores de Puerto Rico (en adelante, "Colegio de Ingenieros y Agrimensores"). En ésta, a grandes rasgos, arguyeron que la Ley Núm. 319-1938, *infra*, la cual creó el referido colegio y exige la colegiación compulsoria de los ingenieros y agrimensores como condición para poder ejercer dicha profesión en nuestra jurisdicción, era inconstitucional. En específico, argumentaron que la obligación de pertenecer al Colegio de Ingenieros y Agrimensores impuesta por el estatuto de referencia violentaba su derecho a la libre asociación. En virtud de ello, solicitaron que se decretara la inconstitucionalidad del requisito de colegiación compulsoria dispuesto en la Ley Núm. 319-1938, *infra*.

En respuesta, el Colegio de Ingenieros y Agrimensores argumentó que, dado el interés del Estado en asegurar la seguridad, salud, propiedad y bienestar general de la ciudadanía, el ELA había adoptado un esquema regulatorio para las profesiones en cuestión, el cual estaba basado en la

creación de una Junta Examinadora y el referido colegio. En esa línea, dicha entidad adujo que las funciones que realiza -- en las áreas de protección social, ética y educación continua -- son de suma importancia para la regulación y sostenimiento de la profesión, las cuales, a su modo de ver, no podrían ser asumidas por la Junta Examinadora de Ingenieros y Agrimensores. Por último, indicó que, el declarar inconstitucional la colegiación compulsoria de los ingenieros y agrimensores, tendría como resultado la desreglamentación de estas profesiones, en claro perjuicio del interés público.

Por su parte, el ELA -- realizando, a nuestro juicio, una interpretación errónea y automatizada de lo resuelto por este Tribunal en *Rodríguez Casillas et al. v. Colegio*, 202 DPR 428 (2019) -- presentó ante el foro primario una solicitud de sentencia sumaria. En ésta, y a la luz de lo resuelto por esta Curia en el precitado caso, se allanó a lo solicitado por el señor Reyes Sorto.[1]

Enterado de lo anterior, el Colegio de Ingenieros y Agrimensores presentó, ante el Tribunal de Primera Instancia, su oposición a la mencionada solicitud de sentencia sumaria. En ésta, incluyó una relación de hechos materiales incontrovertidos. Ello, con la intención de demostrar, tal como lo requiere la normativa constitucional que

---

[1] En específico, señaló que este Tribunal en *Rodríguez Casillas et al. v. Colegio*, *supra*, había declarado la inconstitucionalidad del requisito de colegiación compulsoria de los técnicos y mecánicos automotrices, por lo que igual razonamiento debía aplicarse a la colegiación de los ingenieros y agrimensores.

adecuadamente regula estos asuntos,[2] que la Junta Examinadora de Ingenieros y Agrimensores no era -- como argumentaba el señor Reyes Sorto -- el medio menos oneroso para la regulación y protección de la profesión.

Evaluados los argumentos de las partes, y tras varios incidentes procesales no necesarios pormenorizar aquí, entre los cuales había una solicitud del Colegio de Ingenieros y Agrimensores para que se le permitiera descubrir prueba en el presente caso, el Tribunal de Primera Instancia dictó sentencia sumaria. Al así hacerlo, -- y por considerar que la Junta Examinadora de Ingenieros y Agrimensores era la alternativa menos onerosa en el ejercicio de regular a éstos y éstas profesionales -- declaró inconstitucional el requisito de colegiación compulsoria para ejercer las profesiones de la ingeniería y la agrimensura en nuestra jurisdicción.

Inconforme con el proceder del foro primario, el Colegio de Ingenieros y Agrimensores acudió al Tribunal de Apelaciones mediante recurso de apelación. En síntesis, argumentó que el Tribunal de Primera Instancia había errado

---

[2] Nuestra jurisprudencia ha sentenciado que cuando se establece una clasificación sospechosa o se afecta algún derecho fundamental en alguna legislación debemos aplicar el escrutinio estricto. *López v. E.L.A.*, 165 DPR 280 (2005); *Berberena v. Echegoyen*, 128 DPR 644 (1991); *Zachry International v. Tribunal Superior*, 104 DPR 267 (1975). Al amparo de este escrutinio, la clasificación revisada se presumirá inconstitucional, por lo cual será el Estado el llamado a defenderla; para sostener la clasificación, el Estado tendrá que demostrar la existencia de un interés apremiante que la justifique, y, aun cuando se demuestre la existencia de un interés de carácter apremiante, el Estado debe demostrar que el medio utilizado para promoverlo es el menos oneroso. *Domínguez Castro et al. v. E.L.A. I*, 178 DPR 1, 73-74 (2010); *Pérez, Román v. Proc. Esp. Rel. de Fam., 148 DPR 201*, 213 (1999); *San Miguel Lorenzana v. E.L.A.*, *infra*, pág. 425.

al no tomar en consideración los hechos materiales incontrovertidos presentados en la oposición a la sentencia sumaria, al no dar paso a un descubrimiento de prueba, y al concluir que la Junta Examinadora de Ingenieros y Agrimensores era el medio menos oneroso para alcanzar el interés apremiante del Estado de regular la profesión de la ingeniería y la agrimensura en nuestro País.

Oportunamente, tanto el señor Reyes Sorto, como el ELA, comparecieron ante el foro apelativo intermedio. En sus respectivos alegatos, esbozaron argumentos similares a los expresados ante el foro primario.

Así las cosas, examinados los alegatos de las partes, el Tribunal de Apelaciones notificó una *Sentencia* mediante la cual confirmó la determinación del Tribunal de Primera Instancia. Esto, por entender, al igual que el foro primario, que la Junta Examinadora de Ingenieros y Agrimensores ejercía las funciones necesarias para asegurar los estándares adecuados para las profesiones en cuestión, convirtiéndose así en la alternativa menos onerosa a la que llama el ordenamiento constitucional al momento de disponer de casos como éste.

El Colegio de Ingenieros y Agrimensores solicitó la reconsideración del anterior dictamen. Sin embargo, dicha solicitud fue denegada por el foro apelativo intermedio.

Insatisfecho, el referido colegio acudió ante nos mediante recurso de *Apelación*. En esencia, nos señala que el Tribunal de Apelaciones erró al sostener el dictamen sumario

emitido por el foro primario, que declaró inconstitucional el requisito de colegiación compulsoria para poder ejercer las profesiones de ingeniería y agrimensura en nuestra jurisdicción. A su modo de ver, y al no efectuarse un descubrimiento de prueba, el foro primario carecía de los elementos necesarios para determinar si la Junta Examinadora de Ingeniería y Agrimensura, *vis a vis* la colegiación compulsoria de los profesionales que forman parte de estos gremios era, o no, el medio menos oneroso para regular estas profesiones.

Así las cosas, el pasado 21 de marzo de 2023 este Tribunal celebró una vista oral en este caso. En ésta -- el señor Reyes Sorto, el Colegio de Ingenieros y Agrimensores, y el ELA -- pudieron aclarar, abundar y ratificar sus posturas sobre los asuntos aquí expuestos.

Trabada así la controversia, con el beneficio de la comparecencia de todas las partes con interés en el litigio, y luego de la celebración de una vista oral, este Tribunal, por quedar igualmente dividido, revocó las sentencias emitidas por los foros *a quo*. En consecuencia, sostuvo la constitucionalidad del requisito de colegiación compulsoria para poder ejercer las profesiones de la ingeniería y agrimensura en nuestra jurisdicción, según dispuesto en la Ley Núm. 319-1938, *infra*. Como ya adelantamos, estamos conformes con dicho proceder. Explicamos el porqué.

II.

A.

Como es sabido, el Artículo II, Sección 4, de la Constitución del Estado Libre Asociado de Puerto Rico consagra el derecho fundamental del Pueblo a la libertad de expresión y a reunirse de forma pacífica. Art. II, Sec. 4, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 290. El Artículo II, Sección 6, por su parte, incorpora el derecho a que "[l]as personas p[uedan] asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". *Íd.* pág. 299. Ambos derechos -- el de expresión y el de asociación -- son fundamentales para la consecución y el ejercicio de la libertad de conciencia, necesaria en toda democracia. *U.P.R. v. Laborde Torres Y Otros I*, 180 DPR 253, 286 (2010); *P.R.T.C. v. Unión Indep. Emp. Telefónicos*, 131 DPR 171, 186 (1992); *Rodríguez v. Srio. de Instrucción*, 109 DPR 251, 255 (1979).

Ahora bien, no empece a que en nuestra Carta Magna están expresamente consagrados el derecho a la libertad de expresión y a la libre asociación -- del cual se deriva la vertiente negativa, es decir, el derecho a no asociarse --, en múltiples ocasiones hemos sentenciado que tales derechos no son absolutos. *P.N.P. v. De Castro Font II*, 172 DPR 883, 893-894 (2007); *P.A.C. v. E.L.A. I*, 150 DPR 359, 372 (2000); *Democratic Party v. Tribunal Electoral*, 107 DPR 1, 25 (1978). Por tanto, en aquellos escenarios en los cuales se alegue una violación a alguno de estos derechos, "[l]os tribunales debe[rán] ..., sopesar el alcance de la restricción a la libre expresión y asociación y la importancia del interés

gubernamental que anima la restricción, a la luz de la amenaza que la conducta impedida representa para tal interés del Estado". *Rodríguez v. Srio. de Instrucción*, *supra*, págs. 255-256. Lo anterior, pues, "los derechos individuales tienen que entenderse dentro del cuadro general de la sociedad con arreglo a las limitaciones inherentes a la vida en común". 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico, 2576 (1961). Véase, *S.I.U. de P.R. v. Otis Elevator Co.*, 105 DPR 832, 842-843 (1977); *Pérez v. Autoridad Fuentes Fluviales*, 87 DPR 118, 123-124 (1963).

B.

Así pues, al hablar del alcance de nuestros derechos, debemos recordar también aquella norma firmemente establecida en nuestro ordenamiento jurídico que postula que las leyes, reglas y reglamentos se presumen constitucionales hasta tanto un tribunal declare lo contrario. *Aut. Puertos PR v. Total Petroleum et al.*, 2022 TSPR 89, 210 DPR __ (2022*); Brau, Linares v. ELA et als.*, 190 DPR 315, 337 (2014). Véase, *Senado de PR v. ELA*, 203 DPR 62, 83 (2019). De ser necesario, y para realizar la anterior tarea, -- entiéndase evaluar la constitucionalidad de una ley, regla o reglamento --, en nuestra jurisdicción se han desarrollado dos tipos de escrutinios judiciales: el escrutinio racional y el escrutinio estricto. *Berberena v. Echegoyen*, 128 DPR 864, 878-879 (1991); *De Paz Lisk v. Aponte Roque*, 124 DPR 472, 486-87 (1989); *P.I.P. v. C.E.E.*, 120 DPR 580, 626 (1988). Véase, *Garib Bazaín v. Hosp. Aux. Mutuo et al.*, 204 DPR 601,

690 (2020)(Opinión disidente emitida por el Juez Asociado Colón Pérez).

El escrutinio racional, también conocido como "escrutinio tradicional" o "escrutinio mínimo", se utiliza cuando la acción estatal objetada no establece clasificaciones sospechosas o no afecta derechos fundamentales. *San Miguel Lorenzana v. E.L.A.*, 134 DPR 405, 426 (1993*); Berberena v. Echegoyen*, *supra*, págs. 878-880. Véase, *López v. E.L.A.*, 165 DPR 280, 298-299 (2005). En esos casos, la ley se presumirá constitucional si se establece un nexo racional entre el propósito que quiere alcanzar el Estado con el estatuto y la clasificación establecida; siempre que exista una situación que razonablemente justifique la clasificación. *San Miguel Lorenzana v. E.L.A.*, *supra, pág. 426; Berberena v. Echegoyen*, *supra, págs. 879-880; Vélez v. Srio. de Justicia*, 115 DPR 533, 537-538 (1984). Véase, *Garib Bazain v. Hosp. Aux. Mutuo et al.*, *supra*, pág. 690 (Opinión disidente emitida por el Juez Asociado Colón Pérez).

Por otro lado, el escrutinio estricto se utiliza cuando el tribunal determina que -- al legislar o reglamentar -- se estableció una clasificación sospechosa o que la clasificación efectuada afecta algún derecho fundamental. *López v. E.L.A.*, *supra; Berberena v. Echegoyen*, *supra; Zachry International v. Tribunal Superior*, 104 DPR 267 (1975). Véase, *Garib Bazain v. Hosp. Aux. Mutuo et al.*, *supra*, pág. 690 (Opinión disidente emitida por el Juez Asociado Colón Pérez). En específico, en esos escenarios hemos dispuesto

que: (1) la clasificación revisada se presumirá inconstitucional, por lo cual será el Estado el llamado a defenderla; (2) para sostener la clasificación, el Estado tendrá que demostrar la existencia de un interés apremiante que la justifique, y (3) aun cuando se demuestre la existencia de un interés de carácter apremiante, el Estado debe demostrar que el medio utilizado para promoverlo es el menos oneroso. *Domínguez Castro et al. v. E.L.A. I, 178 DPR 1,* 73-74 (2010); *Pérez, Román v. Proc. Esp. Rel. de Fam., 148 DPR 201,* 213 (1999); *San Miguel Lorenzana v. E.L.A., supra,* pág. 425. Es, precisamente, este último escrutinio el que es de aplicación al caso de marras.

### C.

Dicho ello, es menester mencionar aquí que "toda comunidad políticamente organizada tiene lo que hemos llamado el poder público del estado o '*police power*' para salvaguardar la seguridad, la salud y el bienestar de sus habitantes". (Citas omitidas y cita depurada). *Domínguez Castro v. E.L.A., supra,* pág. 36. En el ejercicio de ese poder, la Asamblea Legislativa tiene la facultad de regular y controlar la práctica de las profesiones, -- salvo la jurídica --, a fin de proteger la salud y el bienestar público, así como evitar el fraude y la incompetencia. *Rodríguez Casillas et al. v. Colegio,* 202 DPR 428, 439-440 (2019); *Accurate Sols. v. Heritage Environmental,* 193 DPR 423, 434 (2015); *Matos v. Junta Examinadora,* 165 DPR 741, 755 (2005).

Al respecto, este Tribunal ha establecido que dichas regulaciones no privan a los ciudadanos de sus profesiones. *San Miguel Lorenzana v. E.L.A.*, *supra*, pág. 413; *Asoc. Drs. Med. Cui. Salud v. Morales*, 132 DPR 567, 586 (1993) *Román v. Trib. Exam. de Médicos*, 116 DPR 71, 77 (1985). En particular, hemos sentenciado que las profesiones y oficios se regulan por razones del eminente interés público del que están revestidas. *Íd.*

Recordemos que las agrupaciones profesionales y el ejercicio de este poder por parte del estado no es una creación moderna, en específico:

> [l]os colegios profesionales, como quizás también pueda decirse de las universidades, son criaturas de la Edad Media. Nacen en la Europa del Siglo XI como una derivación de lo que fueron los gremios artesanales y las logias masónicas.
>
> En los diferentes oficios de entonces, se agrupaban aquellos que trabajaban o ejecutaban algún tipo de destreza particular, ya fuera en la construcción, en la orfebrería, la herrería, el comercio, las bellas artes y otros tipos de oficios, todos ellos orientados a la defensa de sus intereses particulares, como también procurando preservar la calidad y ejecución de los servicios prestados[,] así como las diferentes etapas de desarrollo y perfeccionamiento de las destrezas de sus integrantes.
>
> En un principio, la regularización del oficio dependía estrictamente del gremio mismo; es decir, el Estado no jugaba propiamente un rol en el proceso de regularización del gremio o colegio. La especialización de las profesiones a partir del siglo XIX, sin embargo, diversificará grandemente el número de agrupaciones profesionales, ya llamadas colegios profesionales, la normativa legal para su registro, la regularización de las normas bajo las cuales funcionarán, la manera en que competirán entre sí y los códigos o exigencias internas a base de los cuales los miembros de un colegio o gremio profesional deberán conducirse en el ejercicio de tal profesión u oficio. Alejandro

Torres Rivera, "La pertinencia histórica del Colegio de Abogados y Abogadas de Puerto Rico", 16 de abril de 2016.[3]
Son, pues, los colegios profesionales,

entidades de carácter y finalidad social a las que se atribuyen la ordenación del ejercicio de las profesiones, la representación exclusiva de la mismas y la defensa de los intereses profesionales de los colegiados. Son, en efecto, los colegios profesionales una organización social bastante peculiar, puesto que se encuentran en un lugar incierto respecto a su ubicación en el tan manido binomio Estado/sociedad civil: se trata de entidades configuradas por el Estado, de integración casi siempre obligatoria para el ejercicio de una profesión, y a las que se otorgan poderes públicos para el ejercicio de sus competencias pero son, al mismo tiempo, organizaciones que hacen valer los intereses de los miembros de una determinada profesión, intereses en su mayor parte de índole claramente privada. J. Sánchez Saudinós, *Los colegios profesionales en el ordenamiento constitucional*, Madrid, Boletín Oficial del Estado y Centro de Estudios Constitucionales, 1996, pág. 275.

Ahora bien, según expresamos en *Rodríguez Casillas et al. v. Colegio*, *supra*, pág. 474 (Opinión disidente emitida por el Juez Asociado Colón Pérez),

[e]stas instituciones no solo han defendido, y defienden, los intereses de los gremios que agrupan, sino también los de la ciudadanía en general.

Por otra parte, los referidos colegios profesionales cumplen con la importante función de educar, tanto a la sociedad como a sus miembros, sobre los asuntos que atañen a su profesión. De igual forma, se aseguran de que quienes forman parte de su gremio mantengan sus conocimientos actualizados y cumplan con los requerimientos éticos que les rigen, protegiendo así a la ciudadanía de ser víctimas de prácticas ilegales o

---

[3] Esto, según nos expresa el Lcdo. Alejandro Torres Rivera, Presidente del Colegio de Abogados y Abogadas de Puerto Rico durante los años 2016 al 2018, escritor de asuntos laborales, políticos e históricos. Véase, El Post Antillano, https://elpostantillano.net/index.php?option=com_content&view=article&id=17360:alejandro-torres-rivera-sp1702223524&catid=310:historia&Itemid= 1020 (última visita, 28 de marzo de 2023).

un desempeño incompetente por parte de los profesionales a los que estas instituciones regulan.

En esa dirección, [mencionábamos] que "[e]l establecimiento de [colegios profesionales] no tiene por objeto principal la satisfacción de los intereses profesionales, ni aún los colectivos de la profesión, sino la del interés público que pueda suponer el ejercicio de determinada profesión". J. Gálvez Montes, *La organización de las profesiones tituladas*, Madrid, Consejo de Estado y Boletín Nacional de Estado, 2002, pág. 50. Esto responde a que, aunque la exigencia de una titulación funciona como garantía de que solo ejerzan una profesión aquellos que hayan acreditado tener los conocimientos necesarios, existen ciertas profesiones en las cuales -- por sus características particulares -- no basta dicha garantía para proteger el interés público. *Íd.*

D.

En ese contexto, entiéndase, en la búsqueda de proteger adecuadamente el interés público, la Asamblea Legislativa de Puerto Rico aprobó, y el Primer Ejecutivo firmó, la Ley del Colegio de Ingenieros y Agrimensores de Puerto Rico, Ley Núm. 319 de 15 de mayo de 1938, según enmendada, (20 LPRA sec. 731 *et seq.*). Dicha disposición legal regula todo lo relacionado al ejercicio de la ingeniería y la agrimensura en nuestro País.

En lo pertinente a las controversias que nos ocupan, la Sección 3 del mencionado cuerpo de ley establece que "[c]elebrada la primera Asamblea General del Colegio, ninguna persona que no sea colegiado, podrá ejercer la profesión de ingeniero o agrimensor en el Estado Libre Asociado de Puerto Rico". 20 LPRA sec. 733. Por su parte, la Sección 4 dispone que "[s]erán colegiados del Colegio todos los ingenieros [y las ingenieras] y [los] agrimensores [y las agrimensoras] que

estén admitidos a ejercer la profesión de ingeniería y agrimensura en el Estado Libre Asociado de Puerto Rico y cumplan los deberes que esta Ley les señala, así como los reglamentos que ponga en vigor el Colegio y los Cánones de Ética". 20 LPRA sec. 734.

Sobre el alcance de sus deberes y facultades, -- unos íntimamente relacionados a los principios de protección social --, debemos señalar que el Colegio de Ingenieros y Agrimensores tiene la obligación de:

b) [s]alvaguardar y proteger los derechos de sus miembros en todo lo que se refiere al ejercicio de su profesión;

c) [c]olaborar con la Asamblea Legislativa y las Agendas de Gobierno en lo relativo a la reglamentación del ejercicio de la ingeniería y de la agrimensura;

[...]

e) [a]sesorar al Estado en asuntos de su competencia;

f) [p]romulgar y poner en vigor Cánones de Ética Profesional;

g) [p]romover el progreso de la cultura, la ciencia y la tecnología, especialmente en lo relativo a la ingeniería, a la agrimensura y a las artes e industrias auxiliares;

[...]

l) [p]romover normas de excelencia en la práctica de las profesiones y en la utilización de medios justos y razonables para la determinación del cobro de honorarios profesionales;

m) [c]olaborar con las instituciones universitarias y tecnológicas del país hacia el adelanto de la educación superior mediante programas de asistencia económica a estudiantes meritorios y por otros medios;

n) [v]elar por el bienestar de sus miembros y sus deudos mediante el establecimiento de un sistema de beneficios por muerte, incapacidad, retiro y montepío;

[...]

q) [a]doptar un medio rápido, eficaz, justo y razonable para la ventilación de querellas radicadas contra sus miembros;

r) [p]ropulsar medidas y gestiones encaminadas a evitar la práctica ilegal de nuestras profesiones e interponer las acciones administrativas o judiciales que correspondan. Artículo 3, Reglamento del Colegio de Ingenieros y Agrimensores de Puerto Rico, Reglamento CIAPR-R-001, 7 de agosto de 2021.

Como se puede apreciar, son muchas las funciones que el Colegio de Ingenieros y Agrimensores realiza, particularmente en las áreas de protección social, ética y educación continua. Las mismas son de suma importancia para la regulación y sostenimiento de las profesiones de ingeniería y agrimensura en nuestro País.

Es, pues, a la luz de la normativa antes expuesta que procedemos a disponer de las controversias ante nuestra consideración.

III.

Como mencionamos anteriormente, en el presente caso, el Colegio de Ingenieros y Agrimensores, en esencia, sostiene que los foros *a quo* erraron al declarar la inconstitucionalidad del requisito de colegiación compulsoria como condición para ejercer las profesiones de ingeniería y la agrimensura en nuestra jurisdicción. Le asiste la razón.

Y es que, el Juez que suscribe -- quien realiza un acercamiento sustantivo, en vez de procesal, a los asuntos

ante nuestra consideración -- no alberga duda alguna que los requisitos de colegiación compulsoria para practicar determinada profesión en el País pueden cohabitar armoniosamente en nuestro ordenamiento jurídico con el derecho a la libre asociación. **Uno no cancela al otro.**

En ese sentido, -- al igual que muchos tratadistas del tema --, vemos el requisito de colegiación compulsoria para ejercer determinada profesión como una medida de protección social; lo que, a todas luces, constituye el interés apremiante al que se refiere la doctrina constitucional antes expuesta. Y, en lo que respecta a este caso, se trata también de la alternativa menos onerosa para adelantar el referido interés.

**Para llegar a la anterior conclusión, basta con señalar que ninguna de las partes que participaron en la argumentación oral de este caso, -- entiéndase el señor Reyes Sorto, el Colegio de Ingenieros y Agrimensores y el ELA, representando por el Procurador General -- pudo establecer, o demostrarle a este Tribunal, que la Junta Examinadora de Ingenieros y Agrimensores es, al menos, un ente funcional.** Ese ente, precisamente, era el que las partes que se oponían a la colegiación compulsoria de los profesionales de la ingeniería y la agrimensura identificaban como la alternativa menos onerosa para atender los asuntos ante nuestra consideración.

A *contrario sensu*, lo que si queda demostrado en el presente litigio, -- según se desprende del expediente ante nuestra consideración y de la vista oral celebrada --, es

que el Colegio de Ingenieros y Agrimensores es, y ha sido, el ente encargado de, entre otras cosas, adoptar los reglamentos y cánones de ética profesional que rigen la conducta de los ingenieros y agrimensores de la isla, proteger los derechos de sus miembros en todo lo que se refiere al ejercicio de sus profesiones, colaborar con la Asamblea Legislativa y las agencias del gobierno en proyectos de interés para la profesión y el País, promover la excelencia en la práctica de las profesiones y de establecer los programas de educación continua necesarios para que sus miembros provean servicios de la más alta calidad a los ciudadanos de nuestro País. Cabe señalar que dichas tareas, el Colegio de Ingenieros y Agrimensores las ha desempeñado con excelencia.[4]

Es, pues, el Colegio de Ingenieros y Agrimensores el ente que, -- en nuestra jurisdicción --, verdaderamente ejerce las funciones necesarias para asegurar los estándares adecuados para las profesiones en cuestión, convirtiéndose así en la alternativa menos onerosa a la que llama el ordenamiento constitucional al momento de disponer de casos como éste. De la anterior, no albergamos duda alguna.

Se cometieron los errores aquí señalados. El requisito de colegiación compulsoria exigido a los ingenieros y agrimensores para poder practicar su profesión en nuestra jurisdicción es uno constitucionalmente válido.

VI.

---

[4] Inclusive, no se demostró aquí que la Junta Examinadora de Ingenieros y Agrimensores esté realizando dichas tareas.

Así las cosas, al no existir en este Tribunal los votos que exige la Constitución del Estado Libre Asociado de Puerto Rico para sentenciar lo contrario, estamos conformes con el curso de acción seguido por esta Curia en el día de hoy. Véase, al respecto, *P.I.P. v. E.L.A.*, 109 DPR 685 (1980).


Ángel Colón Pérez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Fredy I. Reyes Sorto, Gerardo Cerra Ortiz, Luis S. Berríos Montes, Luis Sousa Gallardo, Antonio Sanes Rosario, Edgardo Camacho García, José T. Santiago Díaz, Daniel Gómez Marrero<br><br>Apelados<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico, por conducto de su Secretaria de Justicia, Honorable Wanda Vázquez Garced<br><br>Apelado<br><br>Colegio de Ingenieros y Agrimensores de Puerto Rico, por conducto de su presidente, Ing. Pablo Vázquez Ruiz<br><br>Apelantes | AC-2021-0072 | |

Opinión disidente emitida por el Juez Asociado señor MARTÍNEZ TORRES, a la que se unieron la Jueza Asociada señora PABÓN CHARNECO y los Jueces Asociados señor KOLTHOFF CARABALLO y señor FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 4 de mayo de 2023.

Desafortunadamente, hoy los ingenieros y agrimensores tienen menos derechos que otros profesionales, porque esta Curia, al estar igualmente dividida, no llegó a un consenso sobre la inconstitucionalidad de la colegiación compulsoria de este gremio. Como consecuencia de esa división, se revoca una determinación de

inconstitucionalidad, que demuestra apego total a la norma que establecimos en Rodríguez Casillas *et al.* v. Colegio, infra, y Rivera Schatz v. ELA II C. Abo. PR II, infra. En esas Opiniones pautamos de forma clara que la colegiación compulsoria limita el derecho fundamental a la libertad de asociación de los grupos profesionales. Por eso, únicamente podemos validar estos requisitos de afiliación obligatoria a un Colegio si el Estado demuestra: (1) que tiene un interés apremiante, y (2) no tiene a su alcance otro medio menos intrusivo al derecho de la persona afectada, para adelantar el interés articulado.

En este caso únicamente nos correspondía evaluar si era imprescindible obligar a los ingenieros y agrimensores a pertenecer a un colegio como condición para ejercer su profesión. Es decir, la controversia se circunscribía a evaluar la validez del factor compulsorio de la membresía a esa entidad y no la subsistencia del colegio o de las facultades que la Asamblea Legislativa le delegó.

Lamentablemente, algunos miembros de esta Curia (so pretexto de delimitar lo que constituye un medio menos intrusivo), proponen que adoptemos un nuevo escrutinio -a mi juicio más laxo- para atender estas controversias. Bajo esa teoría, no bastaría con demostrar que existe un medio menos intrusivo para adelantar el interés apremiante del Estado, sino que sería necesario pasar prueba sobre la viabilidad y efectividad de las alternativas. Discrepo de este raciocinio dado que abre paso a que se evalúen

argumentos impertinentes y especulativos. Peor aún, bajo esa metodología —aunque se afirme lo contrario— indirectamente se revertiría el peso de la prueba y se le facilitaría al Estado la vulneración de derechos fundamentales.

Lo cierto es que en el caso de autos, pese a que el Estado tenía un interés apremiante en regular la profesión de la ingeniería y la agrimensura, no se demostró que la colegiación compulsoria fuera el medio menos intrusivo para adelantar ese interés. Ante ese escenario, procedía declarar la inconstitucionalidad de la colegiación compulsoria de los ingenieros y agrimensores, sin más.

I

El 16 de julio de 2019, un grupo compuesto por ocho agrimensores licenciados (Fredy I. Reyes Sorto, Gerardo Cerra Ortiz, Luis S. Berríos Montes, Luis Sousa Gallardo, Antonio Sanes Rosario, Edgardo Camacho García, José T. Santiago Díaz y Daniel Gómez Marrero) presentaron una demanda contra el Gobierno de Puerto Rico y contra el Colegio de Ingenieros y Agrimensores de Puerto Rico (Colegio). Alegaron que el requisito de colegiación compulsoria lesionaba su derecho a la libertad de asociación.

Por su parte, el Colegio en su contestación a la demanda sostuvo la constitucionalidad del requisito de colegiación compulsoria. Aseveró que este requisito responde al interés apremiante del Estado de salvaguardar

que la ciudadanía reciba servicios de la más alta calidad y competencia, en protección de la salud, la propiedad y seguridad del pueblo. Por esta razón, añadió que la Asamblea Legislativa le concedió un rol importante en la regulación y reglamentación de la profesión. Afirmó que este rol, según el esquema regulatorio actual, es compartido con el Estado, representado por la Junta Examinadora de Ingenieros y Agrimensores (Junta), y requiere de la coexistencia entre la Junta y el Colegio. En esta coexistencia, indicó que le fue delegada la función pública de fiscalizar el comportamiento ético de los ingenieros y agrimensores. Función que, a diferencia de otros colegios, no se limita a referir casos a la junta examinadora, pues este cuenta con un Tribunal Disciplinario y de Ética Profesional. También señaló que la Junta Examinadora le delegó la implementación y administración del programa de educación continua.

Por último, el Colegio enunció que el Estado no posee los recursos económicos, el personal y la estructura administrativa necesaria para descargar efectivamente las funciones de carácter público que realiza, que son sufragadas exclusivamente con las cuotas y con sus demás ingresos. Así, aseveró que la colegiación compulsoria constituye el medio menos oneroso y real que tiene el Gobierno para alcanzar su interés apremiante.

Mientras tanto, el Estado compareció por medio de una moción de sentencia sumaria y solicitó que se declarara

inconstitucional el requisito de colegiación compulsoria al amparo de las Opiniones que emitimos en Rivera Schatz v. ELA II, infra y Rodríguez Casillas v. Colegio, infra. Ultimó que el caso se encontraba listo para ser adjudicado sumariamente ya que la controversia era una estricta cuestión de derecho. Concluyó que, según la Constitución de Puerto Rico, no es permisible que a un ciudadano se le imponga una colegiación compulsoria, en menoscabo de su derecho fundamental a la libertad de asociación, salvo que se articule la existencia de un interés apremiante y se pruebe que el Estado no tiene a su alcance medidas menos intrusivas para adelantar el interés articulado.

En contestación, el Colegio se opuso a la solicitud de sentencia sumaria bajo el fundamento de que habían hechos materiales en controversia. Esencialmente, planteó que la Junta no podía ser considerada como un medio menos oneroso para regular la profesión, porque no tenía la capacidad de asumir las funciones que el Colegio realiza de manera efectiva.

El Tribunal de Primera Instancia acogió la solicitud de sentencia sumaria del Estado y declaró la inconstitucionalidad de la colegiación compulsoria de los ingenieros y agrimensores. Determinó que el Colegio no logró establecer un interés apremiante que justificara la violación del derecho a la libertad de asociación. A su vez, razonó que no se demostró que la colegiación compulsoria era la alternativa menos intrusiva para

alcanzar los objetivos del Estado y enfatizó que la incapacidad presupuestaria no puede constituir una justificación para vulnerar un derecho fundamental. Finalmente concluyó que existían alternativas menos intrusivas de regular la profesión, entre ellas, la colegiación voluntaria.

Inconforme, el Colegio apeló ante el foro intermedio y alegó que el Tribunal de Primera Instancia erró al omitir los hechos incontrovertidos adicionales que le fueron propuestos. En consecuencia, solicitó devolver el caso al foro primario para la continuación de un proceso ordinario en el que se le permitiera pasar prueba sobre la viabilidad concreta y real de las alternativas señaladas como menos onerosas.

Por su parte, en su alegato ante el Tribunal de Apelaciones, el Estado sostuvo su posición respecto a la inconstitucionalidad de la colegiación compulsoria.

Luego de evaluar las posturas de las partes, el Tribunal de Apelaciones confirmó la inconstitucionalidad de la colegiación compulsoria de los ingenieros y agrimensores. Concluyó que la Junta Examinadora tiene la facultad estatutaria de realizar las funciones necesarias para asegurar los más altos estándares en la profesión, sin la necesidad de violar el derecho constitucional a la libre asociación de los demandantes-apelados.

Nuevamente inconforme, el Colegio recurrió ante este Tribunal. En esencia, reiteró que los foros inferiores

erraron al no evaluar la viabilidad y efectividad del mecanismo que se propuso como menos oneroso para regular la profesión.

Por su parte, los demandantes-apelados afirmaron que obligarlos a asociarse con quien no desean, so pena de ser hallados incursos en un delito grave, no puede ser condición válida para ejercer su profesión. Indicaron que el interés del Estado en reglamentar las profesiones de ingeniería y agrimensura se puede adelantar por medio de la Junta Examinadora; no con la colegiación forzosa que atenta contra su derecho fundamental a la libertad de asociación.

Posteriormente, el Estado en su alegato ante este Tribunal —contrario a su posición ante los foros inferiores— alegó que la colegiación compulsoria podría superar el crisol constitucional. Particularmente, adujo que se debía tomar en consideración la viabilidad y efectividad de que la Junta asumiera las funciones del Colegio.

Finalmente, el pasado 21 de marzo de 2023 este Tribunal celebró una vista oral en la cual las partes pudieron abundar sobre sus respectivas posiciones sobre la controversia.

II

A. Libertad de Asociación

Como parte de su poder de razón de Estado, la Asamblea Legislativa tiene la facultad de regular y

controlar la práctica de las profesiones, con excepción de la abogacía. Rodríguez Casillas *et al*. v. Colegio, 202 DPR 428, 440 (2019); Accurate Sols. v. Heritage Environmental, 193 DPR 423, 434 (2015); Matos v. Junta Examinadora, 165 DPR 741, 755 (2005). Hemos expresado que el "[e]stado puede establecer unos requisitos de conocimientos mínimos, capacidad, destreza, entereza moral o cualquier otro que esté racionalmente relacionado con el objetivo de garantizar que los examinados posean la competencia para practicar la profesión en forma adecuada". Marcano v. Departamento Estado, 163 DPR 778, 786 (2005). Sin embargo, al ejercer esta función, no puede coartar el derecho de las personas a asociarse o no asociarse, a menos que no exista una medida menos instrusiva al derecho de los individuos afectados. Rodríguez Casillas *et al.* v. Colegio, supra, pág. 433.

No cabe duda de que el esquema de colegiación compulsoria viola el derecho a la libre asociación. Íd., pág. 448. En la Constitución de Puerto Rico, a diferencia de la Constitución federal, este derecho se recoge de manera expresa. Art. II, Sec. 6, Const. PR, LPRA, Tomo 1, ed. 2016, pág. 299. Rodríguez Casillas *et al*. v. Colegio, supra, pág. 449; Rivera Schatz v. ELA y C. Abo. PR II, 191 DPR 791, 811-812. Por lo tanto, no es necesario dilucidar la aplicabilidad de la doctrina federal para resolver la controversia ante nuestra consideración. Rodríguez Casillas *et al*. v. Colegio, supra, pág. 455.

A su vez, hemos establecido que las controversias que versen sobre el derecho fundamental a la libertad de asociación deben ser analizadas bajo el escrutinio estricto. Íd. pág. 449. El escrutinio estricto constituye el estándar de evaluación más riguroso. San Miguel Lorenzana v. ELA, 134 DPR 405, 425 (1993). Este criterio se utiliza generalmente cuando el Estado interfiere con derechos fundamentales o algún estatuto establece una clasificación sospechosa. Rodríguez Rodríguez v. ELA, 130 DPR 562, 582-83 (1992); R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, pág. 1198.

Así, indicamos que,

> cuando con su proceder el Estado menoscaba un derecho fundamental este **tiene que articular la existencia de un interés apremiante que justifique la necesidad de su actuación.** Además, tal como hemos reconocido con otros derechos fundamentales, **será necesario que el Estado demuestre que no tenía a su alcance medidas menos onerosas que la legislada para lograr el interés articulado.** Solo de esa manera se protege adecuadamente un derecho tan fundamental como el de la libertad de asociación. Además, y conforme al historial que hemos discutido, respetamos la preeminencia que los constituyentes quisieron impartir a este derecho al reconocerlo explícitamente en nuestro documento constitucional. (Énfasis suplido). Rivera Schatz v. ELA y C. Abo. PR II, supra, págs. 813-814.

En esa línea, en mi Opinión de conformidad en el antes citado caso, expresé que

> para sostener una asociación compulsoria el Estado tendrá que ofrecer razones de peso, es decir apremiantes, y deberá demostrar que la

legislación está diseñada estrechamente para alcanzar esos intereses, o sea que no hay otra manera de lograr los objetivos de la legislación impugnada que no sea la asociación forzada. Íd. pág. 824. (Opinión de conformidad, Martínez Torres, Juez Asociado).

Aclarado el estándar que debe sobrepasar el Estado para sostener la validez de una medida que está en conflicto con el derecho a la libertad de asociación, procedo a examinar el esquema regulatorio de las profesiones de la ingeniería y la agrimensura para demostrar por qué procedía declarar inconstitucional la colegiación obligatoria de este gremio.

B. *Colegio de Ingenieros y Agrimensores de Puerto Rico*

Mediante la Ley Núm. 319 de 15 de mayo de 1938, conocida como la Ley del Colegio de Ingenieros y Agrimensores de Puerto Rico, según enmendada, 20 LPRA secs. 731-744 (Ley Núm. 319), se creó el Colegio de Ingenieros y Agrimensores. En el estatuto se dispuso que la colegiación de este grupo de profesionales sería compulsoria. De este modo, se estableció que "ninguna persona que no sea colegiado, podrá ejercer la profesión de ingeniero o agrimensor en el Estado Libre Asociado de Puerto Rico". Sec. 3 de la Ley Núm. 319, 20 LPRA sec. 733.

Al Colegio se le delegaron las facultades siguientes: (a) subsistir a perpetuidad bajo ese nombre; (b) demandar y ser demandado como persona jurídica; (c) poseer y usar un sello; (d) adquirir derechos y bienes muebles o inmuebles; (e) nombrar sus Directores y Funcionarios u

Oficiales; (f) adoptar y enmendar su reglamento; **(g) adoptar o implantar los cánones de ética profesional de los ingenieros y agrimensores que serán incorporados en el Reglamento de la Junta Examinadora; (h) recibir e investigar quejas respecto a la conducta de los miembros en el ejercicio de la profesión;** (i) crear sistemas de protección o beneficios para aquellos profesionales que se retiren por inhabilidad física o edad avanzada y a los herederos o a los beneficiarios de los que fallezcan; (j) ejercitar las facultades incidentales que fueren necesarias o convenientes; (k) **recibir e investigar quejas respecto al ejercicio ilegal de las profesiones y en caso de existir evidencia contra personas no colegiadas, proceder ante las autoridades competentes relativas al ejercicio de las profesiones;** (l) crear programas de servicio a la comunidad; (m) determinar la forma, composición y carácter representativo de sus asambleas, y (n) establecer capítulos estudiantiles en centros de enseñanza. Sec. 2 de la Ley Núm. 319, 20 LPRA sec. 732.

*C. Junta Examinadora de Ingenieros Arquitectos, Agrimensores y Arquitectos Paisajistas de Puerto Rico*

De otra parte, con el propósito de reglamentar el ejercicio de la ingeniería, la arquitectura, la agrimensura y la arquitectura paisajista en Puerto Rico se aprobó la Ley Núm. 173 de 12 de agosto de 1988, conocida como la Ley de la Junta Examinadora de Ingenieros,

Arquitectos, Agrimensores y Arquitectos Paisajistas de Puerto Rico, según enmendada, 20 LPRA sec. 711 *et seq.* (Ley Núm. 173). La citada ley estableció los requisitos para la concesión de licencias para la práctica de la ingeniería y la agrimensura en Puerto Rico. Art. 11 de la Ley Núm. 173, supra, 20 LPRA sec. 711g. Además, creó la Junta Examinadora de los ingenieros y agrimensores, con el propósito de "proteger la vida, la salud y la propiedad, y para fomentar el bienestar público en general". Art. 2 de la Ley Núm. 173, supra, 20 LPRA sec. 711.

A la Junta Examinadora se le delegó la facultad de expedir, renovar, y suspender y/o cancelar licencias y certificados para el ejercicio de la profesión. Arts. 13 y 19 de la Ley Núm. 173, supra, 20 LPRA secs. 711i, 711n. A su vez, se le concedió legitimación para acudir por sí o mediante el Secretario de Justicia a los tribunales para hacer valer las disposiciones de la ley. Art. 6 de la Ley Núm. 173, supra, 20 LPRA sec. 711c-2. También se le delegó la facultad de adoptar cualesquiera reglamentos para regular el ejercicio de la ingeniería y la agrimensura. Íd. Es la Junta Examinadora quien tiene la responsabilidad de impartir exámenes de admisión o reválida al menos una vez al año y llevar un registro oficial de todas las licencias otorgadas a los profesionales. Arts. 9, 10 y 11 de la Ley Núm. 173, supra, 20 LPRA secs. 711g, 711e y 711f. Como parte de esa facultad de licenciamiento, puede conceder licencias especiales o por reciprocidad. Arts. 27

y 28 de la Ley Núm. 173, supra, 20 LPRA secs. 711s-1, 711t. El estatuto también facultó a la Junta para tomar medidas disciplinarias contra este grupo de profesionales. Art. 21 de la Ley Núm. 173, supra, 20 LPRA sec. 711q. Así, la Junta Examinadora puede iniciar, a iniciativa propia o solicitud de parte, cualquier procedimiento disciplinario contra un miembro de la profesión. Íd. En esa tarea, puede emitir citaciones bajo apercibimiento de desacato, tomar juramento, recibir prueba documental o testifical, celebrar vistas y emitir determinaciones fundamentadas. Íd.

Al amparo del poder de reglamentación que se le concedió en virtud de la Ley Núm. 173, supra, la Junta Examinadora estableció su Reglamento Disciplinario y de Ética Profesional, Reglamento Núm. 7749 del Departamento de Estado, 23 de septiembre de 2009 (Reglamento Núm. 7749). El mencionado cuerpo reglamentario dispone que la Junta, *motu proprio* o mediante querella, podrá iniciar un procedimiento de formulación de cargos contra cualquier ingeniero o agrimensor que viole las disposiciones de ley o de los reglamentos. Art. IX del Reglamento Núm. 7749. Asimismo, el Art. VIII del Reglamento Núm. 7749 provee un procedimiento formal de vistas públicas o administrativas ante la Junta Examinadora. Cuando la Junta determine que procede la suspensión provisional o revocación permanente de una licencia, el profesional afectado podrá oponerse por escrito ante la Junta Examinadora, quien le brindará

la oportunidad de ser oído. Art. VIII (B)(2) del Reglamento Núm. 7749. Si la parte afectada estuviera inconforme con la determinación de la Junta, podrá solicitar reconsideración. Art. VIII (B)(4) del Reglamento Núm. 7749. De esta denegarse o resolverse de forma adversa, el ingeniero o agrimensor podrá solicitar revisión ante el Tribunal de Apelaciones. Art. VIII (B)(5) del Reglamento Núm. 7749.

### III

El curso de acción a seguir en este caso fue delineado de forma clara en Rodríguez Casillas *et al.* v. Colegio, supra y Rivera Schatz v. ELA y C. Abo. PR II, supra. Nos correspondía dilucidar si la colegiación compulsoria era necesaria, por ser el mecanismo menos intrusivo para adelantar el interés apremiante del Estado en regular la profesión de la ingeniería y la agrimensura, según ordena el escrutinio estricto.

Luego de un análisis exhaustivo de los deberes y facultades delegados a la Junta Examinadora y al Colegio de Ingenieros y Agrimensores, es inescapable concluir que es la Junta Examinadora el organismo regulador de la profesión y el mecanismo menos intrusivo para adelantar el interés apremiante del Estado. La Ley Núm. 173 fue la que instituyó todo el esquema regulador de la profesión en cuestión y creó la Junta Examinadora para implementar este esquema. Para ello, la Asamblea Legislativa dotó a la Junta de extensas facultades regulatorias, entre estas,

según mencioné, las de expedir, suspender y revocar licencias. Los parámetros para regular la profesión los definió la Ley Núm. 173 y la Junta Examinadora puede delimitarlos mediante su facultad de aprobar reglamentos.

El Colegio, como brazo auxiliador de la Junta, posee facultades disciplinarias sobre los colegiados. Estas facultades, contrario a su contención, no son exclusivas ni independientes, ya que a la Junta se le delegaron amplios poderes de disciplinar a los ingenieros y agrimensores. Como facultad independiente del Colegio se encuentra la de elaborar un Código de Ética para que sea implementado por la Junta Examinadora. No obstante, las demás facultades de esta organización, como las de establecer programas de beneficios para los colegiados, programas comunitarios y capítulos estudiantiles, son las facultades típicas de cualquier asociación para el aprovechamiento de sus miembros.

En un intento de justificar la colegiación compulsoria, el Colegio cuestionó la capacidad de la Junta Examinadora para alcanzar el interés apremiante del Estado. Adujo que, a diferencia de otros colegios, el de Ingenieros y Agrimensores se distingue en que se le delegó la facultad de suspender directamente a los colegiados. Apoyó su argumento en la Sec. 2(h) de la Ley Núm. 319, supra, que expresa que: "Cuando se decrete la suspensión por el Colegio, el colegiado no podrá practicar la profesión durante el periodo que dure la suspensión, no

podría disfrutar de las actividades y beneficios que proveen en este capítulo y el reglamento".

En esa línea, el Colegio razonó que, bajo una colegiación voluntaria su facultad disciplinaria dejaría de existir tal cual fue diseñada por la Asamblea Legislativa. Alegato del Apelante, pág. 40. Añadió que la Junta Examinadora no podría suplir ese rol, debido a la falta de recursos económicos y capital humano, lo que frustraría la consecución del interés apremiante del Estado en regular la profesión. De ahí, hilvanó su errada teoría de que no se puede decretar la inconstitucionalidad de la colegiación compulsoria sin antes ponderar la viabilidad de que la Junta Examinadora asuma las funciones del Colegio.

Una lectura desapasionada de la Ley Núm. 319 nos permite reconocer las facultades disciplinarias del Colegio respecto a la tramitación de quejas éticas contra los profesionales colegiados. Sin embargo, sus funciones operan como un brazo auxiliador de la Junta Examinadora y no obran de forma independiente. Es correcto que el Colegio, en virtud de sus facultades investigativas, puede determinar que procede la suspensión de la membresía de un colegiado. Sec. 3 de la Ley Núm. 319, supra. Naturalmente, en atención a la naturaleza compulsoria de la colegiación, la suspensión de una membresía implica que la persona no pueda ejercer su profesión. Íd. No obstante, conforme al esquema regulatorio actual, de determinar que procede la

suspensión de un colegiado, el Colegio debe instituir un procedimiento de cancelación o suspensión de la licencia ante la Junta Examinadora. Véase, Sec. 2(h) de la Ley Núm. 319, supra.[1]

Entonces, la colegiación voluntaria realmente no altera los poderes del Colegio, pues bajo una asociación voluntaria este retendría su facultad de investigar y suspender colegiaciones, y la Junta Examinadora, como ente regulador de la profesión, retendría la facultad de conceder, suspender o revocar licencias. Véase, Art. 16, Ley Núm. 173, supra, 20 LPRA secs. 711 l-n. Más aún, el estatuto del Colegio de Ingenieros reconoce que su facultad disciplinaria sobre los colegiados no tiene el efecto de incidir sobre las facultades independientes de la Junta Examinadora de realizar cualquier procedimiento disciplinario. Sec. 2(h) de la Ley Núm. 319, supra.

Llegado este punto, vemos que la única facultad independiente de naturaleza disciplinaria que se le delegó

---

[1] Para un mayor entendimiento transcribo en su totalidad el inciso h de la Sec. 2 de la Ley Núm. 319, supra, a continuación:

> En los casos que conlleven la suspensión del colegiado, el Colegio instituirá el correspondiente procedimiento de cancelación o suspensión de la licencia ante la Junta Examinadora de Ingenieros y Agrimensores de Puerto Rico dentro de un término no mayor de quince (15) días. Cuando se decrete la suspensión por el Colegio, el colegiado no podrá practicar la profesión durante el periodo que dure la suspensión, no podría disfrutar de las actividades y beneficios que se proveen en este capítulo y el reglamento.

> Nada de lo dispuesto en este inciso se entiende en el sentido de limitar o alterar la facultad de la Junta Examinadora de Ingenieros y Agrimensores de Puerto Rico para iniciar por su propia cuenta cualquier procedimiento disciplinario. Sec. 2(h) de la Ley Núm. 319, supra.

al Colegio fue la de elaborar el Código de Ética de este grupo de profesionales. Sin embargo, nada impide que bajo una colegiación voluntaria, siga siendo el Colegio de Ingenieros y Agrimensores quien proponga los cánones de ética para regir la profesión. De hecho, en la profesión de la abogacía, los cánones de ética más reconocidos de Estados Unidos son los que adoptó la *American Bar Association*, una entidad de membresía voluntaria. Véase, Rivera Schatz v. ELA C. Abo. PR II, supra, pág. 829. (Opinión de conformidad, Martínez Torres, Juez Asociado). Tampoco es necesaria la colegiación compulsoria para investigar y reportar posibles violaciones éticas, ni para ofrecer educación continua. Mucho menos hay que obligar a los profesionales a pertenecer al Colegio por los programas y beneficios que este pueda ofrecer.

IV

La falta de consenso de este Tribunal en esta controversia, a mi juicio responde a que varios compañeros han confundido lo que se requiere demostrar para que una violación al derecho fundamental a la libertad de asociación supere el escrutinio estricto. Reitero que bajo la rigurosidad de este estándar probatorio la colegiación compulsoria puede subsistir exclusivamente si se demuestra que esta es la única manera que tiene a su alcance el Estado de adelantar su interés apremiante de regular la profesión de la ingeniería y la agrimensura. De lo

contrario, la medida debe declararse inconstitucional. Rivera Schatz v. ELA C. Abo. PR II, supra, págs. 813-814.

El argumento de que la Junta Examinadora no sería una medida menos intrusiva que la colegiación compulsoria si no puede asumir las funciones del Colegio, es incorrecto. El diseño del esquema regulador de la profesión nunca ha sido la controversia en este caso, así como no lo ha sido en los casos anteriores en que hemos tenido la oportunidad de expresarnos sobre el tema de la colegiación compulsoria. Nuestros pronunciamientos en Rodríguez Casillas et al. v. Colegio, supra, no estuvieron fundamentados en la capacidad que tenía la Junta Examinadora para asumir las funciones del Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico, por una sencilla razón: no tenía que asumirlas. Al igual que en aquel entonces, en este caso mediante el buen ejercicio de las facultades de la Junta, bajo una colegiación voluntaria, es posible alcanzar el interés del Estado en la regulación de la profesión.

De igual forma, recalco que alterar el esquema regulatorio de las profesiones es función de la Asamblea Legislativa y nuestra determinación sobre la constitucionalidad de la colegiación solo incidiría sobre el factor compulsorio. Esto no tiene el efecto de eliminar la coexistencia entre la Junta Examinadora y el Colegio. Entrar a evaluar la capacidad de la Junta Examinadora para asumir las funciones del Colegio, además de ser un

análisis cuasilegislativo, conlleva tomar como punto de partida una suposición; a saber, que el Colegio va a desaparecer o no podrá ejercer sus facultades estatutarias bajo un esquema de colegiación voluntaria. Sin embargo, esto no es más que una simple hipótesis. En contraposición, podemos tomar conocimiento de que el Colegio de Abogados y Abogadas de Puerto Rico y el Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico, no desaparecieron luego de que declaráramos la inconstitucionalidad de la colegiación compulsoria de estas profesiones.

Por eso, al analizar la constitucionalidad de estas medidas de colegiación obligatoria, hemos dejado intactas las facultades que le fueron delegadas a las juntas examinadoras y a los colegios. De lo único que hemos pasado juicio es sobre la necesidad de obligar a los miembros de una profesión a pertenecer a una asociación en particular para adelantar el interés apremiante del Estado de reglamentar las profesiones. Eso era lo que nos concernía hacer en este caso.

El análisis que proponen algunos compañeros da al traste con la rigurosidad del escrutinio estricto e indirectamente, tiene el efecto práctico de invertir el peso de la prueba en estos casos. Es sabido que, al aplicar este escrutinio en controversias sobre derechos fundamentales, el peso de la prueba recae completamente sobre el Estado y se presume que la medida impugnada es

inconstitucional. San Miguel Lorenzana v. ELA, supra, pág. 425. En ese contexto, coincido con las expresiones del compañero Juez Asociado Rivera García respecto a que "[n]o puede ser de otra manera. La transgresión sustancial por parte del Estado a un derecho fundamental no debe imponer a los ciudadanos y las ciudadanas las dificultades que, naturalmente emanan de los procesos judiciales para que finalmente sea invalidada o sostenida de satisfacerse el escrutinio estricto". Rodríguez Casillas et al v. Colegio, supra, pág. 469. (Opinión de conformidad, Rivera García, Juez Asociado). Si el Estado está interfiriendo con un derecho constitucional, es este quien debe asumir completamente la responsabilidad de probar que esa intromisión puede justificarse y superar así el escollo constitucional. Me temo que bajo la teoría de algunos miembros de esta Curia, aunque se afirme lo contrario, quien alegue que se ha interferido con su derecho a asociarse libremente tendrá que probar que existe un medio menos intrusivo, viable y efectivo, para poder vindicar su derecho. No estoy de acuerdo.

No había razón alguna para apartarnos de nuestros precedentes en Rivera Schatz v. ELA y C. Abo. PR II, Rodríguez Casillas et al. v. Colegio, supra. Mucho menos hay base para proponer que se altere el estándar de análisis de estas controversias. Al amparo del escrutinio estricto, la determinación de que existe un medio menos intrusivo, de por sí toma en consideración su viabilidad,

sin inmiscuirse indebidamente con las funciones del poder legislativo. No llegaríamos a la conclusión de que existe un medio menos oneroso si entendiéramos que no es viable. No obstante, el requisito de que el Gobierno no tenga un mecanismo menos oneroso no equivale a que sea el mecanismo menos costoso o el que menos esfuerzo requiera. Lo que hemos pautado es que el Estado tiene que utilizar la alternativa que menos lesione derechos fundamentales para lograr la consecución de su interés apremiante. Rivera Schatz v. ELA y C. Abo. PR II, supra, pág. 813.  En ese sentido, soy del criterio que el Estado puede tener a su alcance una medida menos restrictiva que requiera reajustes e incluso erogación de fondos para su funcionamiento.  No por eso se justifica validar la vulneración de un derecho constitucional. De lo contrario, en estos casos la alegada falta de recursos y capital humano de las juntas examinadoras seguirá siendo el subterfugio del Estado para argumentar que no tiene otras opciones. Aunque las juntas examinadoras tengan todas las facultades estatutarias para adelantar los intereses apremiantes del Estado, en la práctica, la alegada "efectividad" de estas se equiparará a que no se tenga que hacer ningún esfuerzo para hacerlas "viables". No puedo avalar este proceder. Los derechos fundamentales no pueden quedar supeditados a la capacidad económica y conveniencia del Gobierno.

Queda claro que, en este caso, ni el Estado ni el Colegio de Ingenieros lograron superar el análisis constitucional. Esto es aún más patente en el caso del Estado, quien ante el Tribunal de Primera Instancia solicitó que se dictara sentencia sumaria y de forma categórica afirmó que "cualquier disposición legal que imponga un requerimiento de colegiación o membresía a cualquier entidad para el ejercicio de una profesión regulada por una junta examinadora en virtud de ley, es inconstitucional". Ap. TS 83. Sin embargo, en esta etapa de los procedimientos, por primera vez afirmó que el foro primario erró al conceder la sentencia sumaria por él solicitada y que se debía evaluar la viabilidad del medio menos oneroso. Su proceder me parece sencillamente inaceptable, máxime cuando es precisamente el Estado quien tiene el peso de la prueba en estos casos.

Dicho esto, en la controversia que nos ocupaba, de acuerdo con los poderes y funciones que se le delegaron, la Junta Examinadora y la colegiación voluntaria representaban el medio menos restrictivo para adelantar el interés apremiante del Estado.

En mi Opinión de conformidad en <u>Rivera Schatz v. Col. Abo. PR II</u>, <u>supra</u>, pregunté si era mucho pedir ser democráticos y respetar el derecho de nuestros profesionales a asociarse con quienes quieran y no con quien el Estado ordene. La contestación nueva que con su silencio nos ha dado hoy este Tribunal es que sí, es pedir

demasiado, porque puede que le cueste dinero al Estado. Ahora por primera vez, el reconocimiento de los derechos civiles de un profesional depende de cuánto le cuesta eso al gobierno. Jamás pensé ver ese retroceso en el desarrollo de nuestra doctrina judicial.

Lamentablemente, este Tribunal renunció a su función de decretar la inconstitucionalidad de un esquema que está en conflicto con un derecho fundamental. Ahora, el derecho de asociación de los profesionales que no son abogados es distinto y más laxo. ¿Cuánto tiempo durará el trato privilegiado de los abogados? ¿No deberían tener todos los profesionales el mismo derecho a no asociarse que le reconocimos a los abogados? Al parecer, el Tribunal se dirige a reinsertar a nuestra doctrina constitucional la página negra de la asociación obligada entre profesionales para practicar su profesión. Eso alcanzará eventualmente hasta a los abogados pues esta determinanción pretende modificar -sin decirlo- los precedentes recientes de Rivera Schatz v. ELA y C. Abo. PR II, supra y Rodríguez Casillas *et al.* v. Colegio, supra. Es predecible que pronto llegará el caso que altere el estado de derecho que protege hoy a los abogados y mecánicos automotrices.

Por los fundamentos antes expuestos, disiento respetuosamente. Hubiese determinado la

inconstitucionalidad de la colegiación compulsoria de la ingeniería y agrimensura.


                          RAFAEL L. MARTÍNEZ TORRES
                               Juez Asociado